995 So.2d 1262 (2008)
STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY as Subrogee of Yvette Norman
v.
Gregory R. LeROUGE, Mary J. LeRouge, Hartford Insurance Company, Donnell L. Ducre, Sewerage and Water Board of New Orleans, and National Union Fire Insurance Company.
Mary Jane LeRouge and Shirley LeRouge
v.
New Orleans Sewerage and Water Board, National Union Fire Insurance Company, Donnell L. Ducre, Hartford Insurance Company of the Midwest and Gregory R. LeRouge, Yvette Norman and State Farm Mutual Automobile Insurance Company.
Gregory R. LeRouge
v.
New Orleans Sewerage and Water Board, National Union Fire Insurance Company, Donnell L. Ducre, Hartford Insurance Company of the Midwest, Yvette Norman and State Farm Mutual Automobile Insurance Company.
Nos. 2007-CA-0918 to 2007-CA-0920.
Court of Appeal of Louisiana, Fourth Circuit.
November 12, 2008.
Rehearing Denied December 22, 2008.
*1267 Robert Angelle, Metairie, LA, Michael G. Gaffney, New Orleans, LA, for Defendants/Appellees, Donnell L. Ducre, the Sewerage and Water Board of New Orleans and National Union Fire Insurance Company.
Timothy A. Jones, Lafayette, LA, for Appellant, Gregory R. LeRouge.
Roger S. Bernstein, Roger Scott Bernstein, APLC, Raceland, LA, for Appellants, Mary Jane LeRouge and Shirley LeRouge.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge CHARLES R. JONES, Judge MAX N. TOBIAS, JR., Judge EDWIN A. LOMBARD and Judge Pro Tempore MOON LANDRIEU).
JOAN BERNARD ARMSTRONG, Chief Judge.
Mary Jane LeRouge, her husband, Gregory LeRouge, and his mother, Shirley LeRouge, appeal from a judgment of the trial court dismissing their suit against defendants, Sewerage and Water Board of New Orleans (SWB) and Donnell L. Ducre, and allowing Mary Jane LeRouge and Shirley LeRouge to recover thirty-five percent of their damages from Gregory LeRouge.
The litigation arises from a multi-vehicle collision that allegedly occurred in March of 2002, when a vehicle, owned and driven by Yvette Norman allegedly stalled on Highway US-90B near its intersection with Victory Drive in Westwego, Louisiana. As she attempted to exit to the shoulder of the road, Ms. Norman's vehicle was struck from the rear twice, first by a vehicle being driven by Mr. LeRouge and again by the LeRouge vehicle when it was hit in turn from the rear by a truck being driven by Mr. Ducre, an SWB employee in the course and scope of his employment.
State Farm Mutual Automobile Insurance Company (State Farm), as subrogee of Ms. Norman, filed suit against Gregory and Mary Jane LeRouge, Hartford Insurance Company (Hartford) as Mr. LeRouge's insurer, Mr. Ducre, SWB, and National Union Fire Insurance Company (National Union) as SWB's insurer, for sums paid to its insured and her passengers as a result of the accident. On May 15, 2003, State Farm dismissed its claim against Mary Jane LeRouge voluntarily and without prejudice.
*1268 Mary Jane and Shirley LeRouge filed suit against SWB, National Union, Mr. Ducre, Hartford, Mr. LeRouge, Ms. Norman, and State Farm, alleging that they suffered injuries as a result of the collision, when they were guest passengers in Mr. LeRouge's vehicle.
Mr. LeRouge filed suit against SWB, National Union, Mr. Ducre, Hartford, Ms. Norman, and State Farm for injuries he claimed to have sustained as a result of the collision. On November 7, 2003, Mr. LeRouge dismissed his claim against Hartford voluntarily and without prejudice.
The three actions were consolidated in the trial court on May 15, 2003.
State Farm filed a Motion for Summary Judgment seeking dismissal of all plaintiffs' claims against both State Farm and its insured, which the trial court denied on January 20, 2004.
On March 22, 2004, Mr. LeRouge filed a supplemental and amending petition against Hartford in its capacity as his uninsured/underinsured motorist carrier.
According to the trial court's Pre-Trial Order signed by the trial court's minute clerk and dated March 15, 2005, the matter was fixed for non-jury trial on the merits on September 19, 2005. The record also contains a Jury Trial Order fixing a jury bond and deposit, signed by the trial court Judge on March 15, 2004.[1]
On August 5, 2005, Hartford filed an Offer of Judgment to Mr. LeRouge offering to settle his uninsured/underinsured motorist claim for one dollar, reserving all rights, defenses, and objections. Hartford filed identical Offers of Judgment to Mary Jane LeRouge and to Shirley LeRouge.
The trial was continued to September 25, 2006, and was bifurcated, with the liability of the SWB being tried to the court and the liability of the remaining defendants being tried to the jury. Following a three-day trial, the jury entered the following verdict:
1. Was Yvette Norman negligent? NO.
2. [Not applicable]
3. Was Gregory R. LeRouge Negligent? YES
4. Was the negligence of Gregory R. LeRouge a cause in fact of the plaintiffs' injuries? YES
5. Was Donnell L. Ducre negligent? YES
6. Was the negligence of Donnell L. Ducre a cause in fact of the plaintiffs' injuries? YES
7. Please state the percentage of liability, if any, attributable to the following:
Yvette Norman 0%
Gregory R. LeRouge 35%
Donnell L. Ducre 65%
8. Did Shirley LeRouge suffer any damages as a result of the incident of March 21, 2002? YES
9. Please state what sum of money, if any, would reasonably and fairly compensate Shirley LeRouge for the following:

General Damages [pain and suffering] $6500
Past Medical Expenses $ 837
Total Damages for Shirley LeRouge $7337

10. Did Mary Jane LeRouge suffer any damages as a result of the incident of March 21, 2002? YES
*1269 11. Please state what sum of money, if any, would reasonably and fairly compensate Mary Jane LeRouge for the following:

General Damages [pain and suffering] $50,000
Past Lost Wages $10,050
Past, Present and Future Medical Expenses $20,200
Total Damages for Mary Jane LeRouge $80,250

12. Did Gregory LeRouge suffer any damages as a result of the incident of March 21, 2002? YES
13. Please state what sum of money, if any, would reasonably and fairly compensate Gregory LeRouge for the following:

General Damages [pain and suffering] $3,000
Past Medical Expenses $4,000
Total Damages for Gregory LeRouge $7,000

The trial court found that Mr. Ducre and SWB were not at fault, and rendered judgment on that basis and on the jury verdict insofar as the latter was not inconsistent with the trial court's findings.
The parties filed post-trial memoranda. Mary Jane LeRouge and Shirley LeRouge, and Gregory LeRouge filed motions for judgment notwithstanding the verdict, or, alternatively, for new trial. State Farm filed a motion for new trial or, in the alternative, to amend the judgment to reflect the award of its subrogation claim. Hartford moved to amend the judgment or, alternatively, for a new trial to reflect the jury verdict of no fault and no liability for Ms. Norman.
Following a hearing on the post-trial motions held on February 23, 2007, the trial court entered judgment on March 21, 2007 as follows:
1. Denying the motions seeking to apportion fault to Ms. Norman;
2. Denying the motions seeking to apportion fault to Mr. Ducre and SWB;
3. Granting the motions seeking to apportion 100% of the fault and liability to Mr. LeRouge;
4. Denying the motions seeking to increase the monetary damage awards to Shirley LeRouge and to Mary Jane LeRouge, and upholding the jury's damage awards to those plaintiffs; and
5. Granting State Farm's and Ms. Norman's motions to amend the judgment to reflect judgment in favor of State Farm in the amount of $9,827.30 against Mr. LeRouge and Hartford as Mr. LeRouge's liability insurance carrier.
On May 17, 2007, Mr. LeRouge filed a Motion for Devolutive Appeal against Mr. Ducre and SWB. On the same day, Mary Jane LeRouge and Shirley LeRouge filed a Motion for Devolutive Appeal against Mr. Ducre and SWB.[2] For the reasons that follow, we amend in part and, as amended, affirm the judgment of the trial court.
Mr. Ducre's deposition testimony was read into the record at trial.[3] Mr. Ducre testified that he held a commercial driver's license, drove cargo carriers, 109 Howsers, tanks, two-and-a-half ton trucks and dump trucks during his military service, and had been driving SWB trash trucks for about two or three months prior to the accident in question. On the day in question, he was driving from a pumping station to the River Birch Landfill, on the West Bank Expressway toward Highway 90, traveling in the middle lane of traffic. He testified that it had rained earlier in the morning, *1270 and the street was "a little wet." He had been traveling in that lane for a mile or two, at a speed of thirty-five or forty miles per hour, approximately fifteen feet behind a van, when he saw the van run into the back of a car that he estimated was moving at no more than two or three miles an hour. He hit his brakes in an attempt to avoid hitting the van, slid into the van at an estimated speed of fifteen to twenty miles per hour, and testified that he thought the van hit the car again. Had he attempted to swerve to avoid the van, Mr. Ducre believed he would have hit the vehicles that were on either side of his truck. He stopped, and went to the van to determine if anyone had been hurt. He saw that the only damage to his truck was to the radiator, and that the rear bumper of the van was damaged and the van's rear window was shattered. Mr. Ducre admitted that the investigating police officer issued him a ticket for following too close.[4] He went to the Jefferson Parish court where he chose to pay the fine rather than appear before a Judge.
Yvette Norman also testified at trial by deposition.[5] She testified that she had routine maintenance performed on her car at Wal-Mart and Pep-Boys, including oil changes about every two months or 3,000 miles. She went to the dealer for extraordinary repairs, such as when the engine warning light was activated, or when she received service cards from the dealer, approximately four times a year. She brought her car to the dealer in February of 2002 because she heard a pinging sound in the direction of the engine. Except for the noise, the car was running well, had been driven 62,985 miles, and showed no other signs of problems such as excessive oil leakage or smoke, and the car was not running hot. The dealer, Don Ducote Mazda, gave the car a "service tune-up" at that time, including replacement of plug wires, four new spark plugs, an AI element, a fuel filter, a BG30K kit, a gasket, motor oil change and transmission flush for which Ms. Norman produced a receipt. Ms. Norman and her brother picked up the car from the dealership and noticed no problems. Ms. Norman testified that she used the car daily to travel from her home in New Orleans East to her mother's home on the West Bank of New Orleans, where she left her children, and on to the school in Metairie where she worked as a nurse.
Ms. Norman testified that she had had no trouble with her car from the time it was serviced in February until the time of the accident. She testified that she was driving down the Westbank Expressway in the middle lane at about forty to forty-five miles per hour when she heard a pinging noise again. According to Ms. Norman, she had not heard the pinging noise from the time she picked up the car from the dealership in February until just before the accident. She drove for five or ten minutes, looking along the roadway for a service station. When she saw a service station on the other side of the expressway, she put on her left turn signal and looked around to determine if she could pull out of the line of traffic, and, while attempting to look back in her rear view mirror was struck from behind by the van. She denied that her car was stalling when *1271 the van struck it. She testified that she had not applied her brakes, and her foot was still on the gas when her car was hit.
Ms. Norman testified that the van struck her car twice, with the first impact being more severe. She also testified that the radio in her car was turned off and she did not hear any evidence to indicate that the driver of the van applied his brakes prior to the first or second impacts. The second impact occurred "right after" the first.
Gregory LeRouge testified at trial that he was fifty-six years old at the time of the accident, describing himself as a "tough old bird".[6] He is employed by the Jefferson Parish School System as a health and physical education teacher for kindergarten through fifth grade students. At the time of the accident, he was on a year-long sabbatical. He was driving his van, his mother, Shirley LeRouge, was seated in the front passenger seat and his wife, Mary Jane LeRouge, was seated in the van's middle seat. The family had stopped for breakfast at a restaurant in Harvey and was going to their grandchildren's school is Metairie to celebrate Grandparents' Day.
According to Mr. LeRouge, the weather was sunny at the time of the accident. He was driving within the speed limit with the flow of traffic when he realized that the car in front of him had slowed and almost stopped. He applied his brakes, but, as his car stopped, it bumped Ms. Norman's car. He testified that his car did not go more than three feet after the collision. Almost instantaneously, no more than two seconds later, he heard the screeching of brakes and, with his foot on the brake, braced himself, holding on to the steering wheel as tightly as he could. His car was hit from the rear and he was thrown forward. Because he was wearing his seatbelt, he did not hit the windshield. He was then thrown backward, and heard his seat break. He slammed on his brakes and was stuck in the middle lane with traffic passing him on both the right and left sides.
Mr. LeRouge testified that of the two impacts, the second, between the SWB truck and his van, was the harder. He described his impact with Ms. Norman's car as "zero" and the impact with the SWB truck as "a ten".
On cross-examination, Mr. LeRouge testified that he saw Ms. Norman's car coming to a slow stop approximately fifteen feet from her car. He had no warning that she had stopped, did not see brake lights or a turn signal, applied his brakes, stopped, and, according to his testimony, "touched her bumper". He was unable to swerve into another lane to avoid the accident because of traffic in both the left and right lanes.
According to Mr. LeRouge, the investigating officer issued a citation to him. Subsequently, Mr. LeRouge appeared in court, pled not guilty and the charges were dismissed.
On cross-examination, Mr. LeRouge admitted to an inconsistency between his trial testimony and the sworn testimony he gave at his pre-trial deposition. At trial, he testified that the accident occurred on the Westbank Expressway, past the Victory Drive intersection. The distance between the last traffic light he passed through and the point of impact was approximately sixty feet. He went through the green light at that intersection with *1272 another car, not Ms. Norman's directly in front of him. At the deposition, he had testified that when he came through the green light, it seemed that Ms. Norman was moving with him. He admitted that his memory would have been better at the time he gave his deposition than at trial, two years later.
On further cross-examination, Mr. LeRouge admitted that he was injured in a slip and fall accident while teaching in 1980, and was injured in another slip and fall while working for the United States Department of Agriculture in 1969. In the latter incident, he bruised his coccyx or tailbone. In 1996, he was involved in an automobile accident on Opelousas Street and Vallet Street in New Orleans. He was also involved in an automobile accident on Tullis Street.
Mary Jane LeRouge testified that she was reading a newspaper in the back seat of the van when she felt a tap and put the paper down to see what had happened. Neither she nor anyone in the car experienced anything unusual. Instantly thereafter, the van was slammed in the back. Glass broke in the back window and flew into the car, and Mr. LeRouge's seat broke and slid back onto her leg. Her head and hands were cut, and her leg was caught behind his seat. Minutes later, paramedics climbed into the car and shoved the seat off her, so that she could climb out. She got out of the car and sat for a moment on the curb. She saw the back and right side of the van had been smashed.
Shirley LeRouge, Mr. LeRouge's mother, testified[7] that she was seventy-nine years old at the time of the accident. When driving toward the Huey P. Long Bridge, her son said, "Oh, my God. There's a car there." He slowed down and all of a sudden she said, "Oh, my God. We tipped it." She testified that the car was stopped, with no lights. Her son put on his brakes, and tipped the car. At that time, nothing had happened to her, to her son, or to her daughter-in-law. Then she felt what she described as a "wham", and her knees went into the dashboard, although she was wearing her seat belt. At that point, everything that was loose in the car "went flying all over". She testified that the second impact occurred when an SWB truck crashed into the back of the LeRouge van. She confirmed Mr. LeRouge's testimony that the traffic prohibited him from swerving to the right or left to avoid the collision with Ms. Norman's car. She also confirmed previous testimony concerning the shattering of the rear window glass, the failure of the driver's seat, and the subsequent injuries to her daughter-in-law. However, according to this witness, two or three minutes passed between the van's collision with Ms. Norman's car and the SWB truck's collision with the van. When questioned more closely, she testified that the interval between the two collisions was less than a minute, and was more a matter of seconds.
Because various aspects of this appeal are to be reviewed under varying standards of review, and in the interest of clarity, we shall now consider the appropriate standard to be applied to the issues presented by the appellants herein. Where, as in the instant bifurcated trial, the allocations of fault determined by the jury and by the trial court are inconsistent, we review that issue de novo, without according any weight to the factual findings of the judge or the jury. Sevin v. Parish of Plaquemines, 04-1439, p. 4 (La.App. 4 Cir. 4/27/05), 901 So.2d 619, 621-22; Smith v. City of New Orleans, 91-2185, 91-2186, *1273 91-2187, 91-2188 (La.App. 4 Cir. 3/12/93), 616 So.2d 1262, both cases citing McCullough v. Regional Transit Authority, 90-1720 (La.App. 4 Cir. 1/9/92), 593 So.2d 731, 734-36.[8] In this case, we find no inconsistency between the fault allocations made by the jury and by the trial court. The jury had no authority to determine the fault of SWB; it did, however, have authority to allocate fault to the remaining defendants, and chose to allocate thirty-five percent of the fault to Mr. LeRouge. The trial court had no authority to determine the fault of any defendant except SWB through its driver, Mr. Ducre. It allocated "zero" fault to SWB through its driver, Mr. Ducre. This Court examined thoroughly the issue of inconsistency in the context of bifurcated trials in Madison v. Ernest N. Morial Convention Center-New Orleans, 00-1929, 01-1127 (La. App. 4 Cir. 12/4/02), 834 So.2d 578, and concluded that there is no irreconcilable inconsistency where the total fault assigned is less than or equal to one hundred percent. Id. at pp. 12-13, 834 So.2d at 587.[9] The trial court's allocation of no fault to SWB does not impinge upon the jury's fault allocation, and the jury's allocation of thirty-five percent fault to Mr. LeRouge does not impinge on the trial court's fault allocation. In the instant case, the total allocation of fault is thirty-five percent, and the allocation, therefore, is not inconsistent as that term is understood in this context.
Where a legal error has tainted the fact finding process, the verdict is not reviewed under the manifest error standard and, if the record is complete, the appellate court may make a de novo review of the record and determine the preponderance of the evidence. Rosell v. ESCO, 89-0607 (La.9/12/89), 549 So.2d 840, 844 fn. 2; Gonzales v. Xerox Corp., 55968 (La.10/1/75), 254 La. 182, 320 So.2d 163. In the instant case, Mr. Ducre admitted to having violated La.R.S. 32:81 A, following too closely under the contemporaneous road conditions. Such a statutory violation constitutes negligence per se. This negligence is fully supported by the testimony of Mr. LeRouge and Mr. Ducre and by the objective evidence contained in the photographs of the vehicles taken immediately after the accident occurred. Because of this legal error, we are compelled to conduct a de novo review of the record to determine whether and/or to what degree Mr. Ducre's per se negligence was a cause in fact of the accident.[10]
By analogy to the review of awards of general damages for personal injuries, the trier of fact is owed some deference in allocating fault, for the finding of percentages of fault pursuant to the comparative fault article, La.C.C. art. 2323, is also a factual determination. There is an analogy between excessive or inadequate quantum determinations and *1274 excessive or inadequate fault percentage determinations. In both, the trier of fact, unlike the appellate court, has had the benefit of witnessing the entire trial and of reviewing first hand all the evidence. After the court of appeal finds a "clearly wrong" apportionment of fault, it should adjust the award, but only to the extent of lowering or raising it to the highest or lowest point respectively which is reasonably within the trial court's discretion. See, Clement v. Frey, 95-1119, 95-1163, pp. 7-8 (La.1/16/96), 666 So.2d 607, 610-11. Therefore, we apply the abuse of discretion standard to the jury's allocation of thirty-five percent fault to Mr. LeRouge, and we review the allocation of fault to Mr. Ducre and SWB de novo.
The LeRouges contend that their damage awards are insufficient and should be increased. They cite LeBlanc v. Allstate Ins. Co., 00-1128 (La.App. 5 Cir. 11/28/00), 772 So.2d 400, in support of their claim that this Court should conduct a de novo review of their damage awards. In that case, our colleagues of the Fifth Circuit held:
Because the jury failed to reach the issue of damages, we must set an appropriate damages award based on the record. In making an initial award of damages at the appellate level, we are not limited to an award of either the lowest or highest amount we would affirm. Instead, we set the award in an amount which is just compensation for damages revealed by the record. [Emphasis added; citations omitted.]
Id. at p. 7, 772 So.2d at 405.
By its own terms, the LeBlanc decision applies only where the trier of fact did not reach the issue of damages, and the appellate court is called upon to make an initial damage award. That is not the situation in the instant case, where the jury made the specific damage awards noted hereinabove.
In this case, the trial court did not disturb the jury's findings as to the total amount of special and general damages sustained by the plaintiffs. We apply the manifest error standard of review to the award of special damages and the abuse of the trier of fact's great, even vast, discretion to the award of general damages. See, Rosell v. ESCO, supra, 549 So.2d at 844-845; Youn v. Maritime Overseas Corp., 92-3017 (La.9/3/93), 623 So.2d 1257, cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest error  clearly wrong standard demands great deference to the trier of fact's findings, for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of *1275 appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v. ESCO, supra 549 So.2d at 844-845.
Mr. LeRouge, and Mary Jane and Shirley LeRouge contend that the trial court's application of the sudden emergency doctrine to find Mr. Ducre and, hence SWB,[11] to be free from fault is contrary to the law and the weight of the evidence.
The trial court, in its reasons for judgment, found as facts that Mr. Ducre was faced with an emergency resulting from the collision between Mr. LeRouge's van and Ms. Norman's car, an emergency caused by Mr. LeRouge's negligent failure to avoid hitting Ms. Norman's car. This factual finding is reviewable under the manifest error standard.
The Louisiana Supreme Court recognizes the sudden emergency doctrine, defining it as follows in Hickman v. Southern Pacific Transport. Co., 51386 (La.5/1/72), 262 La. 102, 262 So.2d 385, 389:
One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.
The courts have refused to extend the sudden emergency doctrine to situations in which the party asserting the doctrine was also negligent. Ducombs v. Nobel Ins. Co., 03-1704, p. 6 (La.App. 4 Cir. 7/21/04), 884 So.2d 596, 600, citing Clement v. Griffin, 91-1664, 92-1001, 93-0591, 93-0592, 93-0593, 93-0594, 93-0595, 93-0596, 93-0597, 93-0648 (La.App. 4 Cir. 3/3/94), 634 So.2d 412, 439, and Wiley v. Safeway Ins. Co., 99-0161 (La.App. 3 Cir. 7/14/99), 745 So.2d 636.
The Louisiana negligence standard was set forth by the Louisiana Supreme Court in the landmark case, Roberts v. Benoit, 91-0394 (La.9/9/91), 605 So.2d 1032. In order to prevail on a negligence claim under La.C.C. arts. 2315 and 2316, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) actual damages (the damages element.) To meet the cause-in-fact element, a plaintiff must prove only that the conduct was a necessary antecedent of the accident, that is, but for the defendant's conduct, the incident probably would not have occurred. The critical test in Louisiana, however, is phrased in terms of the "ease of association" which melds policy and foreseeability into one inquiry: Is the harm which befell the plaintiff easily associated with the type of conduct engaged in by the defendant? The essence *1276 of the legal cause inquiry is whether the risk and harm encountered by the plaintiff fall within the scope of protection of the duty. The standard negligence analysis we employ in determining whether to impose liability under La. C.C. art. 2315 is the duty/risk analysis, which consists of the following four-prong inquiry:
I. Was the conduct in question a substantial factor in bringing about the harm to the plaintiff, i.e. was it a cause-in-fact of the harm which occurred?
II. Did the defendant owe a duty to the plaintiffs?
III. Was the duty breached?
IV. Was the risk, and harm caused, within the scope of protection afforded by the duty breached?" Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94) 646 So.2d 318, 321-22. The question of whether a duty exists in a particular set of circumstances is a question of law for the court to decide. Id. at 322.
Pursuant to our de novo review of the record on the issue of the fault, vel non, to be assigned to Mr. Ducre and SWB, we find that Mr. Ducre's conduct in following too close to the LeRouge van under the conditions then existing was a substantial factor in bringing about the harm to the plaintiffs, that is, it was a cause in fact of the accident and the ensuing damages suffered by the plaintiffs. As a driver in traffic, closely following the van and the Norman car, Mr. Ducre owed a duty of care to the occupants and owners of those vehicles. By following too closely, in violation of the relevant statute, Mr. Ducre breached that duty. The risk of injury through a rear-end collision, and the personal injury and property damage to the occupants of the van and to Ms. Norman were within the scope of protection afforded by the duty Mr. Ducre breached. The collision and resulting damages are easily associated with his negligent action in following too closely under the circumstances. The occupants of the van testified that they felt only a slight tap when they struck Ms. Norman's car, and that the rear windshield broke and Mr. LeRouge's seat failed only after the van was hit by Mr. Ducre's truck. Although Ms. Norman testified that she felt the first impact was harder than the second, we note that the van, whose brake Mr. LeRouge testified he was applying with all of his strength, effectively stood between the SWB truck and her car at the time of the second impact. Our independent review of the evidence convinces us that Mr. Ducre's statutory violation contributed sixty-five percent to cause the accident.
For the foregoing reasons, we amend the judgment rendered below, and assess sixty-five percent of the liability for this accident to SWB and its driver, Mr. Ducre.
Mr. LeRouge, and Mary Jane and Shirley LeRouge, contend that the jury's verdict and the trial court's finding that his own negligence was the cause-in-fact of his injuries is without support when the record is viewed as a whole. In the alternative, they contend that if he is deemed to have legally caused the injuries he sustained, the trial court's apportionment of 100% of fault to him, and the jury's apportionment of 35% of fault to him, are unreasonable in light of the totality of the evidence contained in the record, and should be reduced.
We review the jury's finding that Mr. LeRouge was responsible for the accident to the extent of thirty-five percent under the manifest error standard of review. We note that the jury was presented with credible testimony from Ms. Norman that she had not stopped her vehicle in the roadway and that it had not stalled. *1277 The jury heard contrary testimony from Mr. LeRouge. In the absence of overwhelming or, in this case, any, contradictory objective evidence, the jury was free to accept Ms. Norman's testimony. It would not be unreasonable for the jury to conclude that had Mr. LeRouge slowed his vehicle to adjust to the reduced speed of Ms. Norman's car, his van and the SWB truck would have avoided the collision. Furthermore, the jury was shown photographs of the vehicles taken immediately after the accident that showed the relative damage to the rear of Ms. Norman's car, to the front and rear of the LeRouge van and to the front of the SWB truck.
The trial court correctly instructed the jury as follows:
A following motorist who strikes a preceding motorist from the rear is presumed to have breached the standard of care and hence is presumed negligent. Thus, the burden rests upon that following motorist to exonerate himself.
A following motorist is not negligent if he keeps his vehicle under control, if he closely observes the forward vehicle that he followed at a safe distance under the circumstances.[12]
Based upon the record, taken as a whole, we find that the jury's conclusion, assessing thirty-five percent of the fault in this accident to Mr. LeRouge, is not manifestly erroneous or clearly wrong, and is supported by the testimony and objective evidence of record.
Mr. LeRouge contends that his damage award is inadequate, and should be increased.
Mr. LeRouge suggests that the jury's award for past medical expenses should be increased to $5,693.04, and the jury's general damages award should be increased to $30,000.00.
Mr. LeRouge testified that by the day after the accident, he felt stiff. He decided to make an appointment with a chiropractor, Dr. Ronald Collins, who already was his treating physician.[13] Dr. Collins treated him with electrical stimulation and hot and cold compresses, and a realignment adjustment of his back. Mr. LeRouge said he started having neck, shoulder and back pain. He described the level of his pre-accident pain on a scale of one to ten as a two or three, and after the accident as a nine or ten.
Mr. LeRouge testified that Dr. Collins referred him to Dr. Paul Yuratich, a general practitioner, in April of 2002 for an MRI examination. Dr. Yuratich's medical records were admitted into evidence. The MRI report indicated mild to moderate osteoarthritis on the body margins at C5-C6 and C6-C7 discs, but no fracture or dislocation and no obvious disc narrowing. The MRI also showed a small spur on the posterior-inferior margin of the fifth cervical body. Dr. Daniel R. Rovira of Diagnostic Imaging Services concluded that there were hypertrophic-degenerative findings within the lumbar spine with neural foraminal stenosis at the presumed L5-S1 level secondary to hypertrophic changes. There is no testimony in the record that these conditions relate directly to the accident.
Because of Mr. LeRouge's recurring headaches, Dr. Yuratich referred him to *1278 Dr. Michael A. Puente, a neurologist,[14] who saw him on April 16, 2002. He testified that he saw Dr. Puente at least three or four times; however, Dr. Puente's records introduced at trial indicate only one consultation with Dr. Puente. The record contains Dr. Puente's April 16, 2002 evaluation of Mr. LeRouge, following which the doctor concluded that Mr. LeRouge suffered from combined muscular cervicalgia and muscle contraction type headaches, related to the accident. Dr. Puente recommended a trial of two Skelaxin tablets three times daily and Esgic Plus for breakthrough headaches. He asked that Mr. LeRouge return in a month for a follow-up appointment.
Mr. LeRouge testified that he considered Dr. Collins to be his primary doctor, and believed he was getting better under Dr. Collins' care.
Mr. LeRouge identified the following medical bills incurred during his treatment: $4,185 from Dr. Collins; $160 from Dr. Puente; $46 from Dr. Yuratich; $1,251.80 from Diagnostic Imaging for X-ray and MRI; and $50.24 for prescription medication.
On cross-examination, Mr. LeRouge admitted he was in error during his sworn deposition testimony when he denied having seen any health care professional with complaints of back problems before the March, 2002 accident. He admitted that he had seen Dr. Collins for back complaints approximately thirty times prior to the accident. He also admitted on further cross-examination that he had seen orthopedist Dr. Cashio of Jefferson Orthopedics for back problems and sacroiliac problems and bone spurs prior to the accident.
Mr. LeRouge saw Dr. Collins approximately forty-one times during the nine months following the accident. He was released or told that he had reached maximum medical cure in January of 2003, and claims that he saw Dr. Collins following his release for accident-related problems. Mr. LeRouge testified that he continues to see Dr. Collins every week or two for a chiropractic adjustment.
On cross-examination, Mr. LeRouge admitted that when he went to West Jefferson Hospital (West Jefferson) immediately after the accident, he refused medical treatment. He testified that his shoulder, neck and lower back were injured in the accident. He admitted that this testimony was contrary to his sworn deposition testimony, in which he testified that the only injury was to his back.
Dr. Collins testified by deposition.[15] He holds a Louisiana chiropractic license and had practiced in Louisiana for nineteen years at the time his deposition was taken in 2003. According to Dr. Collins, Mr. LeRouge first consulted him in September of 2001, for hip, low back and right leg pain and numbness that Mr. LeRouge claimed had been ongoing for two or three years. According to the history Mr. LeRouge gave Dr. Collins, he had been involved in two prior automobile accidents that he did not relate to his 2001 complaints. Dr. Collins performed an orthopedic/neurological examination and took X-rays, finding muscle spasm in the low and mid back and neck, and palpatory tenderness with some low back swelling. He found Mr. LeRouge to be overweight, with normal range of motion and pain of flexion and extension on his lumbar range of motion. *1279 He also found positive Kemp test signs, showing involvement of the lower lumbar joints indicating a likelihood of disc involvement. Mr. LeRouge also had a positive Soto Hall test showing involvement of the lumbar area. The remaining tests were within normal limits. He diagnosed low back pain (lumbalgia) but did not suspect a herniated lumbar disc. The X-rays indicated little major degenerative changes, although he did discern decreased disc height in the bottom three lumbar discs. Dr. Collins opined that Mr. LeRouge's weight caused his pelvis to rotate forward, causing a constant pull on the sacrum. As the anterior sacrum pulls forward, the body has to compensate with weight bearing, so, in turn, the lumbar musculature has to tighten more than it actually should, which will bring Mr. LeRouge back up. This compensation causes loss of posterior disc height on the lumbar discs. Dr. Collins also testified that, prior to the accident, there was evidence that the nerve root at L5-S1 was being pinched and irritated because of Mr. LeRouge's weight and posture. Because of these conditions, there was indication of more involvement in that he was irritating the posterior facets of his spine.
Dr. Collins testified that he continued to treat Mr. LeRouge through the time of the accident. Treatments included manipulation and adjustment of cervical, thoracic and lumbar vertebrae, and adjustment of the pelvis and sacrum. He noted complaints of the lower back, knees and cervical spine, and performance of chiropractic realignments of the posterior superior iliac spine, and of the ilium, all prior to the accident. Dr. Collins was also working on Mr. LeRouge's cervical and thoracic spine, and on January 23, 2002, made adjustments to his lumbosacral spine, L-5 vertebra and sacrum.
Dr. Collins saw Mr. LeRouge on March 18, 2002, just three days before the accident, when Mr. LeRouge presented complaining of pain in his knees. Dr. Collins performed a sacroiliac adjustment to relieve pressure on the posterior disc joints. As of March of 2002, Dr. Collins was seeing Mr. LeRouge regularly twice a month. Dr. Collins testified that Mr. LeRouge was then in continuing need of further treatment.
Dr. Collins saw Mr. LeRouge the day after the accident. His chief complaints at that time were headache, neck and shoulder pain and stiffness, lower back and knee stiffness and mid-back pain. Mr. LeRouge did not give any history of injuring his knees in the accident. The reference to his knees was possibly a continuation of his prior problems, according to Dr. Collins. Dr. Collins also referred the low back stiffness to Mr. LeRouge's pre-accident condition, although the breaking of the seat in the accident would have been "a concern of his low back". Dr. Collins performed the orthopedic and neurological tests that had been done the previous year and found decrease in initial cervical range of motion, but normal limits in the lumbar spine. Dr. Collins also noted low back pain in flexion and extension that were the same as reflected in the 2001 tests. The Kemp test was positive, as it had been in 2001. The straight leg raising tests (Braggard's and Laseque's) gave mixed results: the Laseque's test was positive on both sides, indicating possible lumbar involvement, but the Braggard's test was negative, indicating no inflamed disc. This result indicates lumbar and probable pelvic involvement but not enough disc inflammation to create a positive Braggard[16] *1280 result. There was no indication of radiating pain, and the lumbar range of motion was normal. Dr. Collins found cervical, thoracic and bilateral lumbar spasm. In the November 12, 2001 examination, Dr. Collins had noted similar cervical and lumbar bilateral muscle spasm and right thoracic spasm. Ultimately, Dr. Collins diagnosed cervical sprain/strain, cervicalgia, thoracic sprain/strain and pain, and lumbar pain/strain. A later MRI showed some disc inflammation at L5-S1. Dr. Collins reviewed the MRI film and agreed with the medical doctor, Doctor Rovira, that there was minimal broad-based disc protrusion or inflammation, but that there was no evidence of herniation. Dr. Collins testified that he had no pre-accident MRI films, so he could not tell whether these findings existed prior to the accident. According to Dr. Collins, Mr. LeRouge did have lumbar symptoms and lumbar involvement prior to the accident. He noted that the 2001 lumbar X-rays showed the same findings as the post-accident lumbar X-rays taken on March 22, 2002. However, the films do not indicate a person's degree of pain. Dr. Collins reiterated that the narrowing, wearing down and general degeneration of the disc are a function of wear and tear, depending on many factors, including posture and weight. Dr. Collins noted that more wear and tear pressure in place occurs where the spine bends, in the lumbar and sacral pelvic areas including L5-S1 and L4-L5.
Dr. Collins' original working diagnosis was muscle spasm. The prior general diagnosis of lumbalgia, or lumbar pain, was still involved. Dr. Collins treated Mr. LeRouge on March 25, 2002 for neck and mid back complaints and for lumbar spine stiffness. He was treated four times through the rest of March, 2002; ten times in April, 2002; nine times in May, 2002, eight times in June, 2002; three times in July, 2002; three times in August, 2002; twice in September, 2002; once in October, 2002; once in November, 2002; and, finally, on January 13, 2003, when Mr. LeRouge continued to complain of occasional leg discomfort. According to Dr. Collins, Mr. LeRouge's leg and low back condition had gotten worse. He told Mr. LeRouge that he had probably reached his maximum improvement, but has continued to treat him since. Dr. Collins testified that he did not restrict Mr. LeRouge's activities at any time, and did not definitely diagnose disc damage as a result of the accident. Dr. Collins testified that he released Mr. LeRouge from acute care for the accident-related injuries on February 12, 2003.
Dr. Collins testified that a month after his release, Mr. LeRouge fell over a child at work, and saw Dr. Collins for treatment about twice a month thereafter with the exception of July of 2003. Dr. Collins did not relate the fall to the accident.
When questioned by plaintiffs' counsel at his deposition, Dr. Collins testified that it is more probable than not that Mr. LeRouge is continuing to have problems that are associated with or an aggravation of a condition resulting from the accident.
Mr. LeRouge admitted that since he was on sabbatical at the time of the accident, he sustained no lost wages.
Mr. LeRouge submitted the following medical bills:

Dr. Collins (DeGaulle Chiropractic) $4,185.00
Dr. Puente $ 160.00
Dr. Yuratich $ 46.00
Diagnostic Imaging (MRI) $1,251.80
Prescriptions $ 50.24
 Total: $5,693.04

*1281 As noted hereinabove, we apply the manifest error standard to the jury's award of special damages of $4,000.00, and the abuse of discretion standard to the jury's award of general damages in the amount of $3,000.00
In considering the reasonableness of the jury's apparent deduction of $1,603.04 from the total medical bills submitted by Mr. LeRouge, we note that there was uncontradicted evidence before the jury that Mr. LeRouge had seen Dr. Collins regularly prior to the accident, had not been released as having achieved maximum cure at the time of the accident, and that he considered Dr. Collins to be his doctor. The jury's medical expenses award represents approximately a forty percent deduction from Dr. Collins' chiropractic services bill. We conclude, from the record taken as a whole, including the testimony of Mr. LeRouge and Dr. Collins, that the jury could determine reasonably from that record that this portion of Dr. Collins' chiropractic treatment was not related to the accident, but was a continuation of his long-standing treatment of Mr. LeRouge's pre-existing conditions. The remaining award is a reasonable allocation to the effects of the accident, including aggravation of those pre-existing conditions.
The standard for appellate review of general damage awards is difficult to express and is necessarily non-specific, and the requirement of an articulated basis for disturbing such awards gives little guidance as to what articulation suffices to justify modification of an award perceived to be overly generous or parsimonious. Nevertheless, the theme that emerges from this State's jurisprudence is that the discretion vested in the trier of fact is "great," and even vast, so that an appellate court should rarely disturb an award of general damages. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Youn v. Maritime Overseas Corp., supra.
The jury's general damage award to Mr. LeRouge is clearly not generous. However, it is not obviously the result of passion or prejudice, and it bears a reasonable relationship to the elements of the proved damages. Many rational triers of fact could have decided that a higher award would have been more appropriate, but we cannot conclude from the entirety of the evidence viewed in the light most favorable to the prevailing party in the trial court, that a rational trier of fact could not have fixed Mr. LeRouge's award of general damages at the level set by the jury or that this is one of those "exceptional cases where such awards are so gross as to be contrary to right reason". See, Bartholomew v. CNG Producing Co., 832 F.2d 326, 331 (5th Cir.(La.) 1987); Youn v. Maritime Overseas Corp., supra. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. In effect, the award must be so high or so low in proportion to the injury that it "shocks the conscience". Moore v. Healthcare Elmwood, Inc., 91-0041 (La.App. 5 Cir. 6/5/92), 582 So.2d 871.
Considering the record in its entirety, and the jury's reasonable conclusion that approximately forty percent of Dr. Collins' medical treatment was related to Mr. LeRouge's pre-existing condition, we cannot say that the jury was unreasonable in awarding him $3,000.00 in general damages.
*1282 For the foregoing reasons, we affirm the jury's award to Mr. LeRouge of special damages in the amount of $4,000.00 and of general damages in the amount of $3,000.00.
Mary Jane LeRouge contends that her damage award is inadequate, and should be increased.
Ms. LeRouge suggests that the jury's general damage award should be increased to $200,000.00.[17]
Ms. LeRouge testified that an ambulance arrived at the scene of the accident about ten minutes after the impacts. At that time, she was in the van, unable to exit because of the weight of the driver's seat on her lower body. Paramedics climbed into the van, applied towels to wipe the blood on her hands and head, removed the seat and helped her to the ambulance. The paramedics took Ms. LeRouge to West Jefferson's emergency room, where her severely swollen leg was X-rayed. She also underwent a compartment compression test. In this test, a large needle with a gauge on the end was shoved into her leg, giving a reading of the amount of pressure inside the leg. Because the pressure reading was high, she was hospitalized overnight. The test determined that she did not have compartment syndrome. When she went home, she tried to relax, but realized that her neck, back and ribs hurt. She called her chiropractor, Dr. Collins, who X-rayed her and treated her from March 22, 2002 until December 4, 2004.
Prior to the accident, in 2001, she underwent high tibial osteotomy surgery with Dr. Fred Flandry to correct a bowed leg that was causing her knee pain. She was very pleased with the results of the surgery and could walk without pain. Before the accident, she had no plans to return to see Dr. Flandry. On cross-examination, she admitted that she was under treatment by Dr. Collins from September 2001, having seen him on several occasions during the fall of 2001 and January and February of 2002. She visited him because her knee bothered her, and he performed realignments. She complained of back pain in late 2001, after she had worked in her yard lifting heavy things, and received a treatment for that pain.
Dr. Collins testified that he first saw Ms. LeRouge on September 19, 2001, the same day he initially saw her husband. At that time, Ms. LeRouge asked for "an evaluation of my skeleton". She had been dealing with a post-surgical knee and was looking at a misalignment of the tibia that Dr. Collins could manipulate or move to realign the meniscus, the cartilage of the knee joint. The joint spaces in her knee were not straight when she first consulted Dr. Collins, even after her surgery. He performed a knee adjustment each time she saw him, and the result each time was relief of pain symptoms. Dr. Collins opined that the misalignment of her knee was caused by Ms. LeRouge's nursing workload. Prior to the accident, Dr. Collins treated Ms. LeRouge about four or five times each month. The majority of her complaints concerned her knee, although Dr. Collins found spinal misalignments and dysfunction of joints, and worked to realign all four levels of the spine: cervical, thoracic, lumbar and sacral. He treated Ms. LeRouge three times in September, 2001; six times in October, 2001 (for her knees and ankles), and reexamined her in November, 2001, at which time she showed improvement in *1283 her spinal misalignments. X-rays showed that she had more cervical degeneration than her husband, as well as evidence of bone spurring and decrease of cervical disc space. There was also pre-accident evidence of decreasing disc space or disc thinning in her thoracic spine. X-rays of her lumbar spine taken at that time showed misalignment of the posterior joint at L5-S1, with an eleven degree deviation from normal. At office visits on December 3 and December 10, 2001, Ms. LeRouge complained of back pain and low back pain. On her visit on December 17, 2001, she complained of pain, muscle spasm and inflammation in her left hip. Her knee remained asymptomatic, but presented a chronic problem.
Dr. Collins saw Ms. LeRouge after the accident on March 20, 2002. She complained of neck pain, headaches, bilateral pain through the ribs and shoulders, low back pain and a severe left leg pain caused by what Dr. Collins described as a ruptured artery and severe bruising. He diagnosed cervical sprain/strain, cervicalgia, thoracic sprain/strain, lumbar pain/strain and a nonspecific knee/leg injury. He found palpatory tenderness in the affected areas and external edema. He found no difference between the right cervical muscle spasm he had diagnosed in September of 2001 and the spasm of the same muscle he found after the accident. Because Ms. LeRouge was on crutches after the accident, he was unable to perform the Dorso Lumbar Exam. He found she had decreased lumbar range of motion in all ranges with pain in all ranges, but was unable to test her deep tendon reflexes.
Dr. Collins treated Ms. LeRouge three times in March for complaints in the neck, mid back, lumbar and ribs, and gave her ten chiropractic treatments in April, 2002. On April 10 she was showing general overall decrease in symptoms and was continually better thereafter. He no longer treated her knee, which he referred to Dr. Flandry. Dr. Collins saw her on May 6, 2002 and found her better, except that she had a rib complaint probably caused by her seatbelt. He saw no rib misalignment on Ms. LeRouge's X-rays, and no fractures. However, he testified that rib misalignment would not show on the X-rays. Dr. Collins noted that Ms. LeRouge was better on her May 25, 2002 visit, but complained of a stiff neck. Likewise, he noted that she saw him on June 26, 2002, when her knee had improved. Dr. Collins saw Ms. LeRouge twice in July, 2002; once in August, 2002; once in September, 2002; twice in October, 2002; once in November, 2002 and finally on December 4, 2002. Dr. Collins dismissed Ms. LeRouge on December 4, 2002, as to treatment arising from the accident, noting that she was doing well and that she had reached her pre-accident state of health.
Dr. Collins saw Ms. LeRouge on January 6, 2003, for the same general course of treatment that she was undergoing prior to the accident. He continued to see her through April 14, 2003, for the same cervical and thoracic spasm on the left and cervical, thoracic and lumbar spasm on the right. He then saw her about once a month[18] for adjustments of C1 and C2, continuing to the week before he gave his deposition. Dr. Collins testified that these visits in 2003 were not related to the accident.
Ms. LeRouge testified that West Jefferson assigned her to Dr. Robert Shackleton for her follow-up, and he saw her the day after the accident. She admitted on cross-examination that she did not tell Dr. *1284 Shackleton about her prior back pain problem for which she had seen Dr. Collins. She was concerned about the high pressure reading in her leg, taken in the emergency room, and contacted Dr. Flandry, who referred her to Dr. Kyle F. Dickson at Tulane University Hospital (Tulane). Dr. Dickson ordered an ultrasound to determine whether she had a deep vein blood clot. The study report, prepared by Dr. Donald Akers of Tulane, found that Ms. LeRouge had no evidence of acute or chronic deep venous thrombosis, but did have mild to moderate findings consistent with chronic venous insufficiency. Ms. LeRouge admitted on cross-examination that she did not tell Dr. Dickson about her prior treatment by Dr. Collins for back pain, nor did she complain to Dr. Dickson of back pain connected with the accident.
Ms. LeRouge testified that she was not feeling well and was using crutches because she could not put weight on her leg. Because of her concerns, she saw Dr. Flandry, who prescribed physical therapy to get her back on her feet without crutches, with ice packs to the leg to reduce swelling. The doctors told her not to work for a total of five weeks.
Dr. Flandry saw Ms. LeRouge on April 2, 2002. In addition to the swelling in her leg, she had a large hematoma or blood clot in her calf. The jury viewed photographs of Ms. LeRouge's leg following the accident. Dr. Flandry sent her to physical therapy at Tulane. The therapy consisted of exercises in an ice boot that compresses the leg for a few seconds, then releases for a few seconds, with the combination of the ice and pressure reducing the swelling and inflammation. Ms. LeRouge said that this therapy was helpful and that, although it took a while, she did get better.
Ms. LeRouge testified that she saw Dr. Flandry again on July 2, 2002 because she continued to experience swelling, pain and a warm feeling in the area over the hardware remaining in her leg from the 2001 pre-accident surgery.[19] She described the hardware as an F-shaped piece of metal that had been placed about three inches below the bottom of her knee cap, at the tibia. Dr. Flandry had ordered an MRI examination that indicated that there was a possibility that surgery to remove the hardware might be indicated in the future. Ms. LeRouge admitted on cross-examination that the hardware was on the outside of her left knee, not where the bruising from the accident was located, as she described it, on the back of the lower part of her thigh.[20] Ultimately, the hardware was surgically removed in October of 2002. Ms. LeRouge testified that she dreaded this removal surgery and it took her a long time to decide to have the procedure performed. The surgery went well and the hardware was removed very easily without any digging. Ms. LeRouge testified that her recovery went very well and quickly. She did the prescribed exercises and was soon back on her feet. According to Ms. LeRouge, the hardware removal gave her "wonderful relief" of the pain and swelling in her leg.
The hematoma resolved, but as a result of its having been there, fat tissue died, causing a dark spot, which is "tattooing" *1285 from the blood that accumulated in that area. There is also a depression in her leg where the fat tissue died. Ms. LeRouge testified that she had no previous problems in this area, and Dr. Flandry's deposition testimony connects this injury to the accident. Dr. Flandry recommended that she see a plastic surgeon, and on that advice, she consulted Dr. Marilyn Pelias. Ms. LeRouge testified that plastic surgery to repair her calf will cost about $5,500.00. It will involve removal of fat from another part of her body, and injection of the fat tissue into the depression, as well as four or five laser treatments to remove the discoloration. These procedures are considered cosmetic, and, according to Ms. LeRouge, are not covered by her medical insurance policy. She showed her disfigurement to the jury. Dr. Pelias' cost sheet, admitted into evidence, shows that removal of the pigment would require three to five treatments at $500.00 per treatment, for a total of between $1,500.00 and $2,500.00. The fat transfer surgery to remove the indentation in Ms. LeRouge's calf would cost $4,000.00.
Dr. Flandry, an orthopedic surgeon practicing in Georgia, testified by deposition that he is related by marriage to Ms. LeRouge. In 2001, Ms. LeRouge sought his advice, complaining of left knee discomfort. He diagnosed unicompartmental arthritis, and performed a proximal tibial osteotomy to realign her bowed leg. This bowleggedness was causing increased loading in the inner half of her knee. In connection with that procedure, he placed some fixation hardware in her knee as a fairly standard procedure connected with this type of surgery. The course of her treatment following the surgery was uneventful. In August of 2001, Dr. Flandry saw her and found that she was approximately back to her base line condition. Immediately after the accident, Ms. LeRouge called Dr. Flandry, and he eventually saw her on April 2, 2002.[21] At that time, she told him she had been in an accident ten days previous to her visit and had been taken to a hospital for examination. She told him that she had received alarmingly high compartmental pressure readings in her leg. She had also seen Dr. Dickson, whom Dr. Flandry described as a good friend and a traumatologist at Tulane. He reported a negative result from a venous Doppler test, indicating the absence of blood clots in her leg. Dr. Flandry conducted a physical examination and determined that she had pitting edema from her knee down. Fluid in the tissue was such that when one presses on the tissues with the tip of the finger, it will leave a pit for a minute or two until the fluid incorporates again into the tissue. She had a lot of bruising from the injured part of the tibia to the crest. The sensory nerves were all working normally and the motor nerves were all normal. Her pulses were all palpable. Dr. Flandry recommended therapy, edema control modality and gait training. He recommended that she take a blood thinner and coordinated these recommendations with her New Orleans physician, Dr. Charles Mary, III. The blood thinner would have to be monitored and adjusted on a nearly daily basis to prevent her from getting a blood clot. He recommended that she refrain from work for two weeks, and then return to work.
Dr. Flandry testified that he saw her again on July 2, 2002 and performed a physical examination and an MRI scan. The normal MRI ruled out a lateral meniscus tear, whereupon he concluded that her discomfort arose from the hardware in place after the osteotomy. Dr. Flandry *1286 testified that this difficulty with the hardware is a not uncommon sequel to the osteotomy, and further that he could not relate this problem to the accident. He testified, "I don't think it reallyit really has a relationship there." He removed the hardware in October of 2002.
Dr. Flandry said that the only symptoms he could relate to the accident were some bruising and swelling that continued for a couple of months. Ultimately, those symptoms resolved. As to the necrosis of fatty tissue at the site of the hematoma in her leg, he testified that he has encountered this symptom in his practice as a traumatologist. It is not a structural or functional problem, but a cosmetic problem. The cosmetic treatment would be outside of his specialty. He also testified that the accident set back her recovery from the osteotomy for probably a couple of months. Ultimately, however, she regained all neurological, vascular and musculoskeletal function. Dr. Flandry opined that the problems caused by the automobile accident will not affect her ability to work in the future.
Ms. LeRouge testified that following the accident, she feels a great deal of anxiety when she is a passenger in a car and gets too close to traffic.
Ms. LeRouge testified that prior to the accident she was earning approximately $55,000.00 a year as an intensive care unit (ICU) nurse, on base pay of $24 an hour, plus $1 an hour because she worked in ICU. She received an additional $3 an hour when she worked a night shift from seven to 11, and received an additional four dollars when working a shift from eleven to seven. On weekends she received an additional six dollars an hour. She testified that she missed three hundred four hours of work directly because of her accident-related injury, and calculated her lost wages at $8,600.00. Including the time lost from the unrelated hardware removal surgery, she lost total wages of $11,500.00. The Tulane medical record shows that Dr. Dickson, in consultation with Dr. Frederic B. Wilson, recommended against her returning to work for two weeks from her office visit of May 2, 2002. On cross-examination, she admitted that she testified in deposition that she estimated her lost wages to be $9,202.00. She said that amount sounded correct to her.
The cost of the unrelated surgery to remove the hardware was $8,800.00.
Ms. LeRouge's medical bills were admitted into evidence:

Tulane Hospital, Clinic and Medical
Group $ 4,162.89
West Jefferson Medical Center, Emergency
Room and Ambulance $ 2,397.97
Dr. Robert Shackleton $ 840.00
Open Imaging (MRI) $ 1,050.00
Dr. Ronald Collins (DeGaulle
Chiropractic) $ 3,500.00
Dr. Fred Flandry $ 1,725.00
Dr. Charles Mary, III $ 2,580.00
Prescriptions $ 221.94
 Total: $16,477.80

The jury awarded Ms. LeRouge $20,200.00 in medical expenses and $10,050.00 in past lost wages, for a total of $30,250.00 in special damages. Ms. LeRouge does not contest the special damage award. She claims, however, that the $50,000.00 general damage award is insufficient, and suggests that it should be increased to $200,000.00. As noted in our discussion of Mr. LeRouge's general damage award, this Court may not set aside a properly instructed[22] jury's general damage award unless the jury abused its great, even vast, discretion. While not generous, the $50,000.00 awarded by the jury bears a relationship to the special damage award and does not shock the conscience. The jury saw Ms. LeRouge's residual injury as well as photographs taken of this plaintiff *1287 immediately after the accident. It witnessed her testimony concerning her pain and suffering, and heard testimony that a substantial portion of that discomfort was the result of problems she had with the hardware from the prior unrelated surgery. The jury also heard uncontroverted testimony from Ms. LeRouge's orthopedic surgeon and relative that these hardware issues were not atypical results of that surgery and were not related to the accident. A reasonable inference from that testimony is that Ms. LeRouge would have had difficulty with the hardware that would have necessitated its removal even had the accident not taken place. The jury could conclude reasonably, based on Dr. Flandry's testimony, that the hardware removal and the pain associated with the hardware and its removal were not caused by the accident.
For the foregoing reasons, we affirm the jury's award to Mary Jane LeRouge of $50,000.00 in general damages.
Shirley LeRouge contends that her damage award is inadequate, and should be increased.
After the accident, Shirley LeRouge was taken to West Jefferson, complaining of burning leg pain. The doctor examined her and said she was all right, and that an X-ray would not be appropriate for her complaint of muscle pain. The hospital report, which was admitted into evidence, indicates that a physical examination was conducted, and the examiner concluded she had bruises on the calves of both legs and a contusion of her knees.
On March 26, 2002, she saw Dr. Maureen J. Hecker-Rodriguez. Dr. Hecker-Rodriguez confirmed the finding of posterior bruising to Ms. LeRouge's calves, and referred her to orthopedist Dr. Robert Shackleton, who took X-rays of her leg. Ms. LeRouge testified that Dr. Shackleton told her on April 8, 2002 that she had two fractures.
According to Dr. Shackleton's records, he saw her in November of 2001 for pain in the right knee following a motor vehicle accident in which she told him that she was the driver of a van. X-rays from that accident showed a non-displaced fracture of the inferior pole of the patella. On April 8, 2002, he saw her in connection with the instant accident. Dr. Shackleton found bruising (ecchymosis) about the anterior aspect of the shin that goes around the calves, and a small lump present about the right posteromedial calf. Her neurovascular examination was normal, but X-rays showed non-displaced bilateral proximal fibula shaft fractures. Dr. Shackleton's plan was for Ms. LeRouge to return in two weeks for repeat X-rays, and to limit her to only necessary walking. No medications were prescribed. On cross-examination, Ms. LeRouge admitted that she was never ordered to bed rest, never had to use a cane, and that her fractures had healed after three months with no residual problems.
Dr. Shackleton saw Ms. LeRouge on June 3, 2002, when she was still complaining of burning in both legs, pointing to the medial aspect of the knee as the location of the burning. Dr. Shackleton noted that Ms. LeRouge walked as much as she wished and was not limited by pain when walking. His examination showed tenderness around the knees' tendons, but noted that she had full motion of the knees. While she was tender down the medial aspect of her tibias, her fibulas were not tender. X-rays showed that the post bilateral fibular fractures had healed. Ms. LeRouge was to return if the burning feeling did not resolve. Dr. Shackleton's records contain information concerning visits in late 2003 and 2004 arising from unrelated falls.
*1288 Ms. LeRouge showed the jury that the coloration left by some of her bruises had not resolved, even several years after the accident, and the jury examined photographs of Ms. LeRouge taken on April 1, 2002.
Ms. LeRouge's medical bills were admitted into evidence:

West Jefferson Medical Center $ 63.00
Dr. Shackleton $674.00
 Total: $837.00

The jury awarded Ms. LeRouge past medical expenses in the amount of $837.00 and general damages in the amount of $6,500.00. Ms. LeRouge does not contest the award for past medical expenses, but suggests that the general damages award is insufficient and should be increased to $40,000.00.
The jury was fully informed of the nature of Ms. LeRouge's injuries, and observed the residual effects of the injury as well as photographs of Ms. LeRouge taken immediately following the accident. The jury heard testimony from Ms. LeRouge concerning the injury, including her own pain and suffering. While not a generous award, it clearly bears a relationship to the amount of special damages awarded. The uncontroverted evidence shows that the fractures that were revealed by X-ray did not cause Ms. LeRouge to be limited at any time in her ability to walk, nor was she ever required even to use a cane. We cannot say that the jury's award for Ms. LeRouge's complaints of some burning and tenderness in her legs for approximately three months shocks the conscience, or that the jury abused its great, even vast discretion in making its general damage award.
For the foregoing reasons, we affirm the jury's award of special damages to Shirley LeRouge in the amount of $6,500.00.
In conclusion, for the reasons set forth in this opinion, we affirm the jury's allocation of thirty-five percent of fault to Gregory LeRouge; we amend the judgment of the trial court to allocate sixty-five percent of fault to Donnell Ducre and his employer, the Sewerage and Water Board of New Orleans; we affirm the jury's awards to Gregory LeRouge of $4,000.00 in past medical expenses and $3,000.00 in general damages; we affirm the jury's award to Mary Jane LeRouge of $50,000.00 in general damages; and we affirm the jury's award to Shirley LeRouge of $6,500.00 in general damages.
AMENDED IN PART AND, AS AMENDED, AFFIRMED.
JONES and LOMBARD, JJ., Concur in the Result.
TOBIAS, J., Concurs in the Result and Assigns Reasons.
LANDRIEU, J. Pro Tempore, dissents in Part with Reasons.
TOBIAS, J., Concurring in the Result and Assigning Reasons.
I respectfully concur in the result. I write separately because, in my view, I find that the majority and dissent either incorrectly state the law of this circuit or misapply it.
The merits trial was bifurcated: the liability of everyone, save the Sewerage and Water Board and Mr. Ducre, was tried by the jury[1] and the liability of the Sewerage and Water Board and Mr. Ducre was tried by the judge. The jury found Mr. Ducre *1289 and ergo the Sewerage and Water Board to be 65% at fault for the accident, and the judge found the Sewerage & Water Board and Mr. Ducre free from fault
Unlike other circuit courts of appeal, this circuit requires an independent review without according any weigh to the factual findings of the jury or judge. Other circuits merely decide whether the judge or jury made a more reasonable finding. Boutee v. Kelly, 02-2451, 02-2452, 02-2453, 03-0426, pp. 5-6 (La.App. 4 Cir. 9/17/03), 863 So.2d 530, 538. Cf. Thornton v. Moran, 348 So.2d 79 (La.App. 1 Cir.), writ denied, 350 So.2d 897 (La.1977); Eppinette v. City of Monroe, 29,366 (La.App. 2 Cir. 6/20/97), 698 So.2d 658; Davis v. Witt, 01-894 (La.App. 3 Cir. 11/13/02), 831 So.2d 1075; Felice v. Valleylab, Inc., 520 So.2d 920 (La.App. 3 Cir.1987), writs denied 522 So.2d 562, 563 (La.1988). The Louisiana Supreme Court has yet to resolve the conflict between the circuits. However, whether I decide this case under either the fourth circuit's rule or that of the first, second, or third circuits, I reach the same conclusion, to-wit, the jury got the result correct insofar as the fault of Mr. Ducre and the Sewerage and Water Board.
I am most impressed with Mr. Ducre's testimony that he was driving a Sewerage and Water Board trash truck (which I understand to be a rather large vehicle) in the middle lane of the Westbank Expressway at a speed of 35 or 40 miles per hour approximately 15 feet behind Mr. LeRouge's van. Putting aside the fact that Mr. Ducre did not contest the traffic ticket that he received for a violation of La. R.S. 32:81 A, even though such is a de facto admission that he was following the LeRouge vehicle too closely, I find that under the circumstances Mr. Ducre was much too close behind Mr. LeRouge given the speed of his vehicle. He cannot claim the benefit of a sudden emergency because he himself was partially at fault for creating the sudden emergency for following too closely. That Mr. LeRouge collided into the rear of Ms. Norman's vehicle caused him to "stop" more suddenly; but that "stop" was only partially the cause of the total accident and resulting injuries. But for Mr. Ducre being only 15 feet behind a vehicle going at least 35 miles per hour, he would have been able to control his vehicle and either avoid the accident or strike the rear of the LeRouge van with less force. The rule of thumb is that one should be at least one vehicle's length behind a preceding vehicle for each ten miles per hour one is traveling. Thus, Mr. Ducre should have been at least three and one-half times the length of his vehicle when going down the Westbank Expressway at 35 miles per hour. (Although the record on appeal does not reflect the length of the Sewerage and Water Board truck, I think it safe to say that it was longer that 4.28 feet in length [15 feet divided by 3.5]).
Sixty-five percent is a reasonable, fair, and correct apportionment of fault to the Sewerage and Water Board.
LANDRIEU, J. Pro Tempore, Dissenting in Part With Reasons.
I respectfully dissent from the majority opinion insofar as it amends the judgment of the trial court to allocate sixty-five percent of fault to the defendants, Donnell Ducre and his employer, the Sewerage and Water Board of New Orleans ("S & WB").
Pursuant to La. R.S. 13:5105, the claims against Mr. Ducre and the S & WB were tried to the district court judge. Following the trial, the trial judge rendered judgment in favor of the defendants, finding that the S & WB and Mr. Ducre were not liable for the injuries sustained by the LeRouge plaintiffs as a result of the accident in question because Mr. Ducre, while driving the S & WB truck, was confronted *1290 with an emergency pursuant to the sudden emergency doctrine[1], which was caused by Mr. LeRouge's failure to exercise due care before striking Yvette Norman's vehicle.
As a basis for conducting a de novo review of the judge's findings of fact and amending the trial court judgment, the majority holds that the trial judge committed legal error by failing to consider Mr. Ducre's admitted violation of La. R.S. 32:81(A)[2] in allocating no fault to him and the S & WB. According to the majority, Mr. Ducre's "statutory violation constitute[d] negligence per se" and was "a substantial factor in bringing about the harm to the plaintiffs, that is, it was a cause in fact of the accident and the ensuing damages suffered by the plaintiffs." I disagree.
Nothing in the record before us indicates that the trial judge, in finding no liability on the part of Mr. Ducre and the S & WB, either failed to consider or rejected Mr. Ducre's deposition testimony admitting that the investigating officer had issued him a citation for following too closely and that he chose to pay the fine rather than contest the citation in court. Moreover, the Louisiana Supreme Court and this court have rejected the concept that a violation of a statute is negligence per se which renders a defendant liable to a plaintiff. Boyer v. Johnson, 360 So.2d 1164 (La.1978); Weber v. Phoenix Assurance Co. of New York, 273 So.2d 30 (La. 1973); Laird v. Travelers Insurance Company, 263 La. 199, 267 So.2d 714 (1972); Lee v. Louisiana Transit Company, Inc., 414 So.2d 838 (La.App. 4th Cir.1982); Martinez v. Modenbach, 396 So.2d 471 (La.App. 4th Cir.1981). There are instances where the violation of a statutory duty is not negligence. Laird, supra, 263 La. at 209, 267 So.2d at 717; Ketcher v. Illinois Central Gulf Railroad Company, 440 So.2d 805 (La.App. 1st Cir.1983).
As I do not agree with the majority that the trial judge committed an error of law in adjudicating the claims against the Mr. Ducre and the S & WB, I believe the trial judge's findings of fact must be reviewed under the manifest error or clearly wrong standard of review.
In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Lam v. State Farm Mutual Automobile Insurance Company, XXXX-XXXX, pp. 6-7 (La.11/29/06), 946 So.2d 133, 138. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Stobart v. State, Department *1291 of Transportation and Development, 617 So.2d 880, 882-883 (La.1993).
In this particular case, the deposition testimony of Mr. Ducre and Ms. Norman were introduced into evidence while the plaintiffs, Mr. LeRouge, Mary LeRouge, and Shirley LeRouge testified at the trial. Mr. Ducre testified that he was driving a S & WB trash truck in the middle lane of the Westbank Expressway, at a speed of thirty-five or forty miles per hour, approximately fifteen feet behind Mr. LeRouge's van, when he saw the van suddenly run into the back of Ms. Norman's car. He said he hit his brakes in an attempt to avoid hitting the van, slid into the van at an estimated speed of fifteen to twenty mile per hour, and testified that he thought the van hit the car again. According to Mr. Ducre, had he attempted to swerve to avoid the van, he would have hit the vehicles that were on either side of his truck.
Ms. Norman testified that at the time of the accident she was driving down the Westbank Expressway looking along the roadway for a service station; her vehicle was making a pinging noise and she wanted to have it checked out. When she saw a service station on the other side of the expressway, she put on her left turn signal and looked to see is she could pull out of the lane of traffic, and, while looking in her rear view mirror, was struck from behind by Mr. LeRouge's van. She denied that her car was stalling when the van struck it. Ms. Norman emphasized that she had not applied her brakes, and her foot was still on the gas pedal when her car was hit. Ms. Norman also testified that the van struck her car twice, with the first impact being more severe. She testified that she heard nothing to indicate that the driver of the van had applied his brakes prior to the first or second impacts. According to her, the second impact occurred "right after" the first.
Mr. LeRouge testified that he was driving within the speed limit with the flow of traffic when he realized that the car in front of him had slowed and almost stopped. He applied his brakes, and as his car stopped, it bumped Ms. Norman's car. Almost instantaneously, no more than two seconds later, he heard the screeching of brakes and his van was struck from behind by the S & WB truck.
Mary Jane LeRouge testified that she was reading a newspaper in the backseat of the van when she felt a tap and put the paper down to see what had occurred. Neither she nor anyone in the van had experienced anything unusual. Instantly thereafter, the S & WB truck struck the rear of the LeRouges' van.
Shirley LeRouge testified that she was in the front seat of her son's van and saw Ms. Norman's car stopped ahead of them with no brake lights. She said Mr. LeRouge slowed down, applied his brakes, and then "tipped" the car. Then she felt what she described as a "wham," when the S & WB truck struck the van. Shirley LeRouge equivocated on the amount of time that had elapsed between the first and second collisions. Initially, she testified that two or three minutes had passed between them. However, when questioned further, she testified that the interval between the two collisions was less than a minute, and more of a matter of seconds.
The trial judge found that Mr. Ducre and the S & WB were not at fault in causing the accident because Mr. Ducre was confronted with an emergency caused by Mr. LeRouge's failure to exercise due care before striking Ms. Norman's vehicle. After reviewing the record and in view of the conflicting testimony, I cannot say the *1292 trial judge's finding was clearly wrong. Further, there is clearly evidence in the record to support the trial judge's finding that Mr. Ducre's actions were not the cause of the initial collision, i.e. the emergency.
Accordingly, I would affirm the trial court judgment in all respects.
NOTES
[1] Although the Jury Trial Order bears the date March 15, 2004, that appears to be a typographical error, as the order was entered on the trial court's minutes on March 17, 2005 and March 31, 2005, and the receipts show that the bond and deposit were paid by Hartford on March 29, 2005.
[2] The parties stipulated that the plaintiffs appealed the judgments of December 18, 2006 and March 21, 2007 only as to Mr. Ducre and SWB.
[3] The deposition identifies the deponent as "Donald Duere"; however, the pleadings and police report refer to him as "Donald Ducre." Counsel indicated at the deposition that the deponent's driver's license would be copied and the copy attached as Exhibit 1 to the deposition; however, the deposition contained in the record on appeal does not include this exhibit. We shall refer to the SWB driver as Mr. Ducre throughout this opinion.
[4] This constitutes a violation of La.R.S. 32:81 A, which provides: "The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway."
[5] None of the parties appealed the jury's finding that Ms. Norman was not at fault in the accident; therefore, her exoneration is final.
[6] The material in quotation marks in this narrative of Mr. LeRouge's testimony consists of direct quotations from his testimony.
[7] The material placed in quotation marks in this narrative of Ms. LeRouge's testimony consists of direct quotations from her testimony.
[8] This standard of review differs from that espoused by our colleagues on the First and the Third Circuits, who review the record in order to decide whether the judge or the jury made a more reasonable finding. See, McCullough, supra, 593 So.2d at 735. The Louisiana Supreme Court has not addressed this conflict among the Circuit Courts.
[9] The Madison court gave the following example: "Only, for example, if the jury had found another defendant to be 60% at fault and the judge had found the [governmental entity] to also be 60% at fault would an irreconcilable inconsistency have arisen, the theory apparently being that the judge and jury need not assign all fault, but that they can in no event assign more than 100% of the fault." Id.
[10] As the Louisiana Supreme Court noted in Laird v. Travelers Ins. Co., 263 La. 199, 209, 267 So.2d 714, 717 (1972), such per se negligence gives rise to liability only where and to the extent that it is a cause in fact of a plaintiff's damages.
[11] It is undisputed that SWB is liable, under the doctrine of respondeat superior, for the negligence, vel non, of its employee, Mr. Ducre. The parties do not dispute that, at the time of the accident, Mr. Ducre was acting in the course and scope of his employment.
[12] La.R.S. 32:81 A; Daigle v. Mumphrey, 96-1891 (La.App. 4 Cir. 3/12/97), 691 So.2d 260; E. Fallon, La. Prac. Trial Handbook for La. Lawyers, § 21.3 "Rebuttable Presumptions", 3d ed.
[13] Mr. LeRouge had been seeing Dr. Collins since September of 2001 for tingling sensations and weakness in his leg, and saw him periodically prior to the accident. He most recently saw Dr. Collins two days before the accident.
[14] Mr. LeRouge identified Dr. Puente as a "neurosurgeon" in his trial testimony; however, Dr. Puente's stationery at the Culicchia Neurological Clinic identifies his specialty as "Neurology", not as "Neurological Surgery".
[15] The material placed in quotation marks in this narrative of Dr. Collins' testimony consists of direct quotations from his testimony.
[16] On deposition, Dr. Collins testified that there was not enough disc involvement to create a positive "Laseque" result; however, his previous testimony in context makes it clear that he misspoke, and that he intended to refer to the lack of a positive "Braggard" result.
[17] Ms. LeRouge does not appeal the jury's award of medical expenses and past lost wages.
[18] Dr. Collins saw Ms. LeRouge twice in June, 2003, once in August, 2003; once in September, 2003; once in October, 2003 and once in November, 2003.
[19] Her Tulane medical record indicates that on that day she saw Dr. Michael E. Brunet, to whom Ms. LeRouge was referred by Dr. Flandry. Dr. Brunet wrote to Dr. Flandry that he examined Ms. LeRouge and found her wounds healing well and the alignment looking "great".
[20] Plastic surgeon, Dr. Marilyn Pelias, referred in her proposal to the location of the bruise as Ms. LeRouge's calf. This is consistent with the photographs and medical records submitted at trial.
[21] He testified that he saw her socially either at a Thanksgiving or Christmas 2001 family gathering, but did not examine her medically again until April, 2002.
[22] No party alleges that the trial court's instructions to the jury were incorrect.
[1] In a bifurcated trial such as the present one, the question of fault of the public entity is put to the jury although, in actuality, the jury is not determining the public body's fault. Boutee v. Kelly, 02-2451, 02-2452, 02-2453, 03-0426, p. 2 n. 2 (La.App. 4 Cir. 9/17/03), 863 So.2d 530, 537
[1] The sudden emergency doctrine, set forth by the Louisiana Supreme Court in Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (La. 1972), provides:

One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.
Hickman, 262 La. at 112-113, 262 So.2d at 389.
[2] La. R.S. 32:81(A) provides, "[t]he driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway."