JOAN BERNARD ARMSTRONG, Chief Judge.
| ,The defendant-appellant, Greg Meffert, appeals a judgment dated April 7, 2010, and, more particularly, that portion of the judgment denying his motion for JNOV. We affirm.
Plaintiffs-appellees, Southern Electronic Supply, Inc. (“Southern”) and Active Solutions, L.L.C. (“Active Solutions”) describe themselves as business collaborators who developed and marketed to the City of New Orleans (“City”) a “crime camera” system designed to provide real time surveillance of the areas where the cameras were installed. They claim that the many defendants enumerated hereinafter, all of whom had connections with the City of New Orleans, or were persons or entities having associations with such persons, were liable to them for many millions of dollars in damages sustained by the plaintiffs’ crime camera business in consequence of the tortious actions of the defendants. Chief among such malefactors of whom the plaintiffs complain is the appellant, Greg Meffert.
Meffert does not present his version of the facts, preferring to confine his appeal to arguments of law.
*937 |2The trial court’s written reasons for judgment issued in connection with the judgment of April 7, 2010, does not get into in depth fact finding detail, limiting the fact findings to little more than the following:
Plaintiff contends that the City, through its employees and/or subcontractors, assisted and facilitated Dell’s sale of crime cameras supplied by Net-Methods and Veracent to Baton Rouge and Gretna, Louisiana and its purchase of crime cameras from Dell in May of 2006. However, the evidence at trial shows that defendant, Greg Meffert, while still employed by the City and responsible for overseeing plaintiffs contract, initiated Dell and Veracent’s sale of crime cameras to the City by informing Dell that the City wanted a “bunch of cameras” but did not “want to use the last vendor”. (Plaintiffs’ Exhibit 37) The jury found Meffert’s actions constituted intentional misconduct. The evidence shows that Meffert had an independent personal stake in the crime camera sales to New Orleans and other cities, and played a pivotal role in assisting Veracent and NetMethods. His actions were clearly outside the scope of his employment with the City.
Further, there is no evidence that Anthony Jones or Mark Kurt, as Chief Technology Officers in the Mayor’s Office of Technology, knowingly assisted or participated in a scheme with Mef-fert. Therefore, the Court does not find solidary liability between the City, Mef-fert, Veracent and Dell.
The plaintiffs present the following version of the facts giving rise to their claims:
As part of the effort to market the cameras to the City, the plaintiffs implemented a pilot crime camera program in 2003 that was overseen by Meffert. At the time, Meffert was serving in the Mayor’s Office of Technology in the capacity of Chief Technology Officer (“CTO”). Meffert was the CTO for the City from 2002 to 2006. As the City’s CTO, Meffert was responsible for all technology-related projects for the City, including the negotiation and oversight of the City’s Contract with the plaintiffs.
IsUpon the successful completion of the pilot program, the plaintiffs engaged in the bidding process required by law, in which the plaintiffs emerged as the successful bidders. The bidding process included a Request for Proposal in 2004 for the manufacture and installation of crime cameras, and a Response to Request for Proposal. In consequence of having submitted the winning bid proposal, the plaintiffs entered into a contract (“Contract”) with the City executed by Mayor Ray Nagin. The Contract had two major provisions pertinent to plaintiffs’ claims: (1) a requirement that the City order a minimum of 240 cameras over a three-year period, and (2) a prohibition preventing the City and/or its representatives/employees from disclosing confidential information regarding the plaintiffs’ proprietary System.
During the duration of the pilot program and throughout the negotiation and execution of the Contract, defendants, Mark St. Pierre[1], Christopher Drake, and Michael *938 Charbonnet, who worked at Meffert’s direction, were assigned to manage the plaintiffs’ Contract with the City. Thus, Meffert, St. Pierre, and Drake all learned confidential information concerning plaintiffs’ System and were bound by the confidentiality provisions of the Contract in their official capacities as employees of the Mayor’s Office of Technology.
Around this time, St. Pierre was a member and/or founder of several private business entities, including Imagine Software, L.L.C., NetMethods, L.L.C., and Veracent L.L.C. The plaintiffs contend that these entities were staffed by the same individuals who were working at the Mayor’s Office of Technology.
|4In July of 2004, Meffert’s office facilitated a meeting between the plaintiffs and Dell, which occurred at the Mayor’s Office of Technology office located at 1515 Poy-dras Street in New Orleans. The meeting resulted in a preliminary understanding between the plaintiffs and Dell regarding Dell’s future collaboration with the plaintiffs to market the plaintiffs’ proprietary “System” nationally and even internationally. After the meeting, Dell and the plaintiffs signed non-disclosure agreements that protected the plaintiffs’ confidential information, and the use of that information was permitted “only for the purpose of and in connection with the Parties’ business relationship.” After the meeting, Drake forwarded to Dell confidential information regarding the proprietary design and underlying costs of the plaintiffs’ System.
The future collaboration between Dell and plaintiffs discussed at the meeting facilitated by Meffert’s office never came to fruition. Instead, Meffert assembled a group of persons (referred to by the plaintiffs as “the Dell team”) to develop, independently of the plaintiffs, cameras and other components of the plaintiffs’ proprietary System, which were then sold to the City through Dell, cutting plaintiffs out of the chain of sale. Plaintiffs assert that NetMethods was formed by St. Pierre for the express purpose of providing Dell with a product identical to that of the plaintiffs based on information obtained from the plaintiffs on a confidential basis.
In late 2005 and early 2006, NetMethods began to manufacture and sell video surveillance systems to Dell that were the same in form and function as those of the plaintiffs. In 2006, Dell and NetMethods sold such video surveillance systems to New Orleans and Baton Rouge. By representing NetMethods as the vendor responsible for New Orleans’ successful “crime camera” system, ^NetMethods and Dell made the sales to Baton Rouge, Lafayette, and Gretna, Louisiana. These were all sales that the plaintiffs claim rightfully belonged to them. The plaintiffs contend that it was at this stage that the Dell Team, with Meffert’s assistance, then directed its efforts toward muscling in on the New Orleans surveillance camera business, which was still under contract to the plaintiffs.
The plaintiffs’ brief goes on to contend that virtually from the inception of the Contract, Meffert tortiously acted in myriad ways that interfered with Plaintiffs’ contractual relationship with the City. According to the plaintiffs, as early as seven days after the plaintiffs received the first deposit to begin work under the Contract, Meffert began to take steps to sabotage the plaintiffs’ reputation and Contract with the City. According to the plaintiffs, Mef-fert deliberately and falsely disparaged the quality of the plaintiffs’ work performance.
*939 The plaintiffs characterized the testimony of Drake, who was the project manager and an employee of Imagine and Veracent, as expressing bewilderment at Meffert’s complaints because just seven days earlier Meffert was touting the plaintiffs’ System as revolutionary. A few months later, in November of 2004, Meffert instructed Drake to prepare an anticipatory breach letter to plaintiffs based on the fact that the plaintiffs had provided only ten of the sixteen cameras they were obligated by the Contract to provide by December 20, 2004.
In the anticipatory breach letter, Mef-fert admonished the plaintiffs as follows: “If you cannot meet the obligations of the [Cjontract ..., the City will be forced to seek other remedies.” The plaintiffs note that the anticipated breach of which they were admonished never materialized because, before the December 20 | r,deadline, plaintiffs had installed 25 cameras, thereby exceeding the dictates of the Contract by more than 150 percent.
Despite the plaintiffs’ compliance with the Contract, Meffert facilitated the purchases of cameras from Dell and Veracent (referred to by the plaintiffs as “co-eon-spirators”) in a number of ways. By way of example, the plaintiffs contend that the evidence supports a finding that Meffert ensured that Dell and Veracent were paid for the cameras they provided to the City, but withheld payment from the plaintiffs. In fact, at the same time that the plaintiffs were being told that “funding for new deployments is not final,” the plaintiffs allege that Meffert was telling Dell that the budgets contained plenty of money to cover the City’s cameras purchased from Dell and Veracent. Meffert also told Dell employee, Kim Fury, that he would pull the City’s crime camera Contract “from the street” for Dell, i.e., he would arrange to have the Contract taken away from the plaintiffs and given to Dell. Thus, Mef-fert, who was still employed by the City and responsible for overseeing the City’s Contract with the plaintiffs, regularly acted improperly as the plaintiffs’ competitor, thereby tortiously interfering with Plaintiffs’ Contract with the City.
The plaintiffs offered a second example of Meffert’s malfeasance: Meffert steered business away from the plaintiffs and directed some $10 million worth of business to St. Pierre’s companies, all during his tenure as CTO. Meffert also actively contributed to the success of NetMethods and the other St. Pierre companies, including Veracent, through marketing, promotion of products, and referrals. Specifically, in May of 2006, Meffert facilitated Dell and Veracent’s sale of video surveillance systems to the City by informing Dell that the City wanted a “bunch of cameras,” but did not “want to use the last vendors,” the last vendors l7being the plaintiffs, despite the plaintiffs’ valid Contract with the City and plaintiffs’ contracts with Dell. Meffert told Dell to contact St. Pierre about cameras, knowing that employees of St. Pierre’s companies would both supply the cameras to Dell and purchase those same items from Dell on behalf of the City. Meffert also received and responded to sales calls from other cities interested in purchasing the video surveillance systems. According to Meffert’s own attorney, Meffert was responsible for $10 million dollars earned by NetMethods.
In exchange for these services, Meffert personally benefitted from the sales of cameras by St. Pierre’s companies to the City and others. Initially, while Meffert was still employed by the City, NetMeth-ods issued an American Express card to Meffert and paid for more than $130,000 worth of purchases and services charged to that card. While employed as CTO for the City, Meffert also discussed going into *940 business with St. Pierre after leaving his employment with the City.
When Meffert finally terminated his employment with the City, he formed a company called Logistix, which shared office space with the St. Pierre companies and entered into a two-year agreement with NetMethods that obligated NetMethods to pay Logistix $67,000 a month for advising, consulting, and support services. Net-Methods ultimately paid Logistix more than $573,000.
However, none of these precise details is critical to the disposition of this appeal as the appellant has chosen to pursue his appeal on legal rather than factual grounds. He assigns no error as to either the explicit or the implicit fact findings of the trial court. Accordingly, the facts according to the plaintiffs as set forth above are intended to serve as background for this case and do not represent the conclusive findings of this Court, although it must be noted that those facts are essentially undisputed by Meffert.
[ 8The plaintiffs initiated legal proceedings in the trial court on April 29, 2007, by filing suit for breach of contract, unfair trade practices, unjust enrichment and tor-tious interference with a contract, all in connection with the July 19, 2004 Contract between the City and Southern to provide surveillance equipment, technology and design as well as installation of “crime cameras” as part of what was referred to as the “City Wide Surveillance Camera Project.” The petition named as defendants Dell, Inc., Thomas H. Welch, Jr., and Steve Reneker
The claims in the plaintiffs’ initial petition focused on alleged violations of a July 20, 2004 Non-Disclosure Agreement executed by and between Active Solutions and Dell and a July 21, 2004 Non-Disclosure Agreement executed by and between Southern Electronics and Dell.
The plaintiffs filed a First Amended and Supplemental Petition on April 30, 2007, naming as additional defendants the following: Imagine Software, L.L.C.; Imagine Consulting, L.L.C.; Imagine GIS, L.L.C.; NetMethods, L.L.C.; Method Investments, L.L.C.; Ciber, Inc.; and Vera-cent, L.L.C. Like the plaintiffs’ original petition, their First Amended and Supplemental Petition focused on alleged violations of the Non-Disclosure Agreements.
On October 4, 2007, the plaintiffs filed a Second Amended and Supplemental Petition for Damages, naming as additional defendants the following: Affiliated International Corporation; Affiliated Computer Services Inc.; the City of New Orleans; Mayor Nagin; Mark Kurt, Mark St. Pierre, Christopher Drake, and Gregory Meffert, the appellant herein. The Second Amended and Supplemental petition noted that Mark Kurt succeeded Meffert as CTO in 2006 and that Christopher Drake was the Operations Manager for the Mayor’s Office of Technology.
|9The plaintiffs Second Amended and Supplemental Petition went beyond the allegations contained in their previously filed petitions which were limited to certain Non-Disclosure Agreements, by adding additional claims concerning the plaintiffs’ Contract with the City to furnish a minimum of 240 surveillance cameras.
This Second Amended and Supplemental Petition referred to Messrs. Nagin, Mef-fert, Kurt, St. Pierre and Drake collectively as the “City Employee Defendants”, alleging that they were all associated with the various “Imagine” defendants originally named above in the First Amended and Supplemental Petition, either in the capacity of owner, manager, consultant or supervisor. The plaintiffs alleged that in these various capacities the City Employee Defendants sought to profit improperly *941 from their connections with the City and from the appropriation to their own advantage of the plaintiffs’ efforts expertise and trade secrets.
On March 24, 2008, the plaintiffs filed a Third Amended and Supplemental Petition for Damages in which they alleged, among other things, that the City Employee Defendants improperly created entities to compete with the plaintiffs when the plaintiffs refused to give them subcontracting work on the Contract that the plaintiffs had with the City. The plaintiffs also alleged that Dell and the City Employee Defendants improperly appropriated and capitalized on the plaintiffs’ proprietary information, expertise and trade secrets.
On August 24, 2008, the plaintiffs filed a Fourth Amended and Supplemental Petition for Damages in which they essentially elaborated on the bad acts of the defendants as set forth in previous petitions.
|10On October 8, 2008, the plaintiffs filed a Fifth Amended and Supplemental Petition for Damages essentially elaborating on the alleged bad acts of defendant Drake and making allegations of loss of business opportunities.
On September 11, 2009, Camsoft Data Systems, Inc. (“Camsoft”) filed a Petition for Intervention naming the plaintiffs as defendants based on allegations that Cam-soft has an interest in the outcome of the case based on a joint venture with the plaintiffs. This petition for intervention was dismissed without prejudice.
On September 16, 2009, Camsoft filed a First Supplemental and Amended Petition for Intervention setting forth at great length and with much greater specificity the facts upon which it alleged it has a claim to all or part of the plaintiffs’ claims.
On the following day the trial court signed an Order granting the motion in limine of NetMethods, L.L.C., Method Investments, L.L.C., and Veracent, L.L.C. to exclude references to the federal criminal investigation, being the same criminal investigation that led to the St. Pierre trial and conviction referred to in footnote number 1 of this Opinion, commencing on page 3 above.
On October 28, 2009, the plaintiffs’ claims against CIBER, Inc. were dismissed with prejudice based on a joint motion arising out of a settlement agreement reached between the parties.
After countless procedural steps that are not pertinent to this appeal, the plaintiffs’ claims against Dell, Inc., NetMeth-ods, L.L.C., Veracent, L.L.C., Imagine Software, L.L.C. and Gregory Meffert were eventually tried to a jury in a lengthy bifurcated trial extending over the course of five weeks, commencing on September 14, 2009. The plaintiffs’ claims against the City were tried at the same time to the trial judge as part of those bifurcated proceedings.
|uOn October 22, 2009 Active Solutions and Southern Electronics filed a Motion for New Trial on Conspiracy to Misappropriate Trade Secrets Claim Against Greg Meffert.
The jury verdict which Mr. Meffert seeks to have overturned with this appeal of the denial of his JNOV motion, was rendered on November 2, 2009, pursuant to the bifurcated trial held on September 14, 2009. In accordance with the jury verdict, the trial court signed a “Partial Final Judgment” dated November 13, 2009, memorializing the findings of the jury regarding the non-public entity defendants, Dell, Inc., NetMethods, L.L.C., Ver-acent, L.L.C., Imagine Software, L.L.C. and Gregory Meffert. That judgment found the defendants to be liable in solido to the plaintiffs for $10,000,000.00 in damages arising out of unfair competition with *942 the plaintiffs crime cameras in violation of the Louisiana Unfair Trade Practices Act, which violations were found to have occurred subsequent to April 20, 2006. Fault was allocated 35% to Dell, 15% to NetMethods, 8% to Veracent, 3% to Imagine Software, LLC, 20% to Mr. Meffert, 10% to the City of New Orleans, and 9% to Christopher Drake. The plaintiffs’ claims under the Louisiana Uniform Trade Secrets Act were denied. Dell’s breach of the non-disclosure agreement with the plaintiffs was found to have caused no damages and was, therefore, dismissed. Plaintiffs’ claim against Dell for punitive damages was dismissed based on a finding that Dell was neither grossly negligent nor malicious in appropriating the plaintiffs’ trade secrets and breaching its non-disclosure agreement. Judgment was rendered in favor of the plaintiffs jointly against Dell in the sum of $2,800,000.00 based on the plaintiffs’ reliance upon Dell promise(s) to engage in the video surveillance business with the plaintiffs. $3,500,000.00 was awarded to the plaintiffs for tortious interference with the plaintiffs’ Contract and 112fault was allocated 30% to Imagine Software, LLC, 43% to Mr. Meffert, and 27% to the plaintiffs. Finally, the jury found Mr. Meffert’s actions with respect to the Contract with Southern Electronics to be “willful, outrageous, reckless or flagrant misconduct.” Therefore, he was found not to be entitled to La. R.S. 9:2798.1 discretionary immunity.
Pursuant to a judgment dated November 9, 2009, the trial court granted the motion for a directed verdict of Method Investments and dismissed with prejudice all claims against it; and granted in part the motion for a directed verdict of Vera-cent and NetMethods and dismissed with prejudice all claims against them for unjust enrichment and tortious interference with contract.
On November 16, 2009, the plaintiffs filed a Motion to Fix Attorneys’ Fees and Costs Pursuant to the Louisiana Unfair Trade Practices Act, praying for an award of 42.5% of $10,000,000.00, plus interest from April 20, 2007 along with $1,272,630.53 in costs.
On November 20, 2009, the plaintiffs filed a Motion for JNOV or, Alternatively, New Trial in which the plaintiffs complained that the jury erred in that: (1) the jury should have awarded damages on the plaintiffs’ Non-Disclosure Agreement claims, having specifically found that Dell breached the Non-Disclosure Agreement; (2) the jury award was manifestly erroneously low in the face of evidence showing that the “Plaintiffs’ lost profits are at a minimum of $662 million and up to $1.9 billion.”; and (3) it was error to assign 27% of the fault to the plaintiffs themselves.
On November 24, 2009 NetMethods and Veracent filed a motion for JNOV.
Greg Meffert also filed a JNOV motion on November 24, 2009. This is the JNOV motion that figures so prominently in the instant appeal. In the | ^memorandum filed in support of the motion, Mr. Meffert contends that there were four flaws: (1) the finding that the plaintiffs were 27% at fault in the breach of their contract with the City provides an independent justification of the breach, thereby precluding any liability on the part of Mr. Meffert for intentionally causing or contributing to that breach; (2) the jury finding that the City breached the Contract and the award of $3,500,000.00 in connection with that breach is contrary to the evidence; (3) the award for intentional interference provides a double recovery for the unfair trade practices allegedly perpetrated by Mr. Meffert; and (4) it was error for the jury to find that Mr. Meffert’s actions constituted “willful, reckless, outrageous or flagrant *943 misconduct” in the face of the jury finding that Mr. Meffert acted based on policy grounds in a matter in which he had discretion to act.
On the same day, Dell also filed a JNOV motion, praying that the plaintiffs’ Louisiana Unfair Trade Practices Act, conspiracy and detrimental reliance claims be dismissed or, in the alternative, that judgment be entered limiting Dell’s liability to $8,100,000.00.
As this was a bifurcated trial, based on the same September 14, 2009 trial, the trial court signed a judgment on February 4, 2010, dismissing the plaintiffs claims against the City of New Orleans.
The April 7, 2010 judgment denying Mr. Meffert’s JNOV motion also granted a JNOV motion filed by defendants Dell and NetMethods resulting in a judgment against them in solido for 81% of the $10,000,000 Louisiana Unfair Trade Practices Act damages awarded by the jury, but exempting them from any liability to the plaintiffs for damages attributed by the jury to Christopher Drake or the City of New Orleans; granted the JNOV motion filed by the plaintiffs regarding 114the jury’s allocation of fault to the plaintiff Southern; denied the JNOV motions filed by Dell, NetMethods, Veraeent, Mr. Mef-fert and the plaintiffs in all other respects; granted the plaintiffs’ motion for attorneys’ fees and costs to the extent of awarding as attorneys’ fees 42.5% of the $10,000,000.00 Louisiana Unfair Trade Practices Act award and costs of $1,267,019.62 in connection with the Louisiana Unfair Trade Practices Act claim. On April 16, 2010, Southern Electronics filed a notice of devolutive appeal as to the dismissal of its breach of contract claim against the City. On April 29, 2010, Dell filed a motion for a suspensive appeal of the judgment of April 7, 2010.
On May 10, 2010 the plaintiffs filed a notice of devolutive appeal pertaining to the August 7, 2009 judgment granting a partial summary judgment in favor of Dell; the September 17, 2009 judgment granting motions in limine to exclude the testimony of Mark St. Pierre; the November 13, 2009 judgment on the jury verdict; and the April 7, 2010 final judgment, averring that the judgment of April 7, 2010 disposed of all the remaining issues in the case, such that all the other judgments became ripe for appellate review.
On May 27, 2010, NetMethods and Vera-cent filed a motion for devolutive appeal from the April 7, 2010 judgment.
On June 1, 2010, Greg Meffert filed a motion for devolutive appeal from the November 13, 2009 judgment on the jury verdict and the judgment of April 7, 2010, especially regarding the rulings on the JNOV motions filed by both Meffert and the plaintiffs, as well as “[a]ll interlocutory judgments, orders and decrees bound up with the aforementioned judgments.
On November 19, 2010, Southern Electronics and the City filed a joint motion to dismiss limited to the “breach of Contract claim against the City of New j ^Orleans ...” This Court granted that motion on November 23, 2010, thereby removing the City as a party to this appeal.
On December 8, 2010, the plaintiffs and Dell filed a joint motion to dismiss all of the plaintiffs’ claims against Dell based on a settlement among those parties. This Court granted the motion on December 9, 2010, thereby removing Dell as a party to this appeal.
On December 21, 2010, NetMethods and Veraeent moved to have this Court dismiss their appeal as moot based on the fact that the plaintiffs have, since the time that NetMethods and Veraeent took this appeal from the judgment against them and in *944 favor of the plaintiffs, filed a notice of Satisfaction of Judgment in the trial court, discharging NetMethods and Veracent from any liability. Accordingly, on December 23, 2010, this Court dismissed their appeal, thereby removing them as parties to this appeal[2].
Therefore, while this case had numerous parties in the trial court, this appeal has now boiled down to Meffert’s appeal and that appeal in turn rests on Meffert’s complaints concerning the April 7, 2010 judgment insofar as it denies Meffert’s JNOV motion.
None of the other matters raised by the plaintiffs or the various former appellants are being pursued in this appeal, and the only parties to appear before this Court to argue this matter are the plaintiffs and Meffert and the only issue is the denial of Meffert’s JNOV motion. Therefore, we shall now address Meffert’s complaints concerning the denial of his JNOV motion.
|u;A trial court’s authority to grant a JNOV under Louisiana Code of Civil Procedure Article 1811 is limited by the jurisprudence to those cases where the jury’s verdict is absolutely unsupported by any competent evidence. Davis v. Lazarus, 04-0582, p. 8 (La.App. 4 Cir. 3/8/06), 927 So.2d 456, 461. As this Court explained in greater depth in Adams v. Voyager Indemn. Ins. Co., 02-1333, p. 3 (La.App. 4 Cir. 10/1/03), 858 So.2d 681, 683-84:
[T]he Louisiana Supreme Court in Joseph v. Broussard Mill, 2000-0628, p. 1 (La.10/30/00), 772 So.2d 94, reiterated the criteria it set forth in Scott v. Hospital Serv. Dist. No. 1, 496 So.2d 270 (La.1986), in determining when a JNOV is proper. As enunciated in Scott, a JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the trial court believes that reasonable persons could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable persons could not reach different conclusions, not merely when there is a preponderance of the evidence for the mover. The motion should be denied if the evidence opposed to the motion is of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions. Scott, 496 So.2d at 274. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. Anderson v. New Orleans Pub. Serv. Inc., 583 So.2d 829, 832 (La.1991). This rigorous standard is based upon the principle that “[w]hen there is a jury, the jury is the trier of *684 fact.” Scott, 496 So.2d at 273; Joseph, 2000-0628, pp. 4-5, 772 So.2d at 99.

Id.

This court elaborated further in Torrejon v. Mobil Oil Co., 03-1426, p. 10 (La.App. 4 Cir. 6/2/04), 876 So.2d 877, 885:
In reviewing a JNOV on appeal, a two-part inquiry is imposed. First, the appellate court must determine if the trial judge erred in granting the JNOV. This is done by using the same criteria *945 that the trial judge applies in | ,7deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable persons could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable persons in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated. Martin, 2000-1023 at p. 6, n. 7, 784 So.2d at 632; Anderson, 583 So.2d at 832; Joseph, 2000-0628 at p. 5, 772 So.2d at 99. Second, “[a]fter determining that the trial correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review.” Martin, 2000-1023 at p. 6, n. 7, 784 So.2d at 632 (citing Anderson, 583 So.2d at 832).

Id.

However, Meffert limits his arguments on this appeal to legal issues. He emphasizes that his appeal is not directed against the fact findings of the trial court. Mef-fert complains in his Reply Brief that the plaintiffs-appellees’ arguments concerning the facts are not relevant to his appeal which is the only appeal remaining before this Court:
[Plaintiffs-jAppellees also attempt to persuade this Court that this matter really arises from a failure to resolve “differences in factual findings.” Once again, as set forth above, the basis of this appeal does not ask this Court to analyze what the jury may have concluded factually. As such, the arguments raised by Appellees in Section 11(A)(2) of the Opposition Brief are of no concern to this Court. The nub of this appeal is simple: Did the trial court commit legal error when it denied the JNOV which sought to reconcile the jury verdict with trial court’s ruling and binding precedent? The appeal is not about factual findings, but rather legal conclusions, most glaringly, was there a breach of the contract, and if not, could the jury still have reached the verdict it did? If there was no breach, as the trial court found, then under extant law, the jury could not have held Mr. Meffert liable for intentional interference. [Emphasis added.]
|1sAs Meffert emphatically insists that his appeal is based entirely on legal issues and is not based on factual disputes (which his attorney reemphasized in his June 8, 2011 letter to this Court described in footnote Number 2 on page 3 of this Opinion), there is no basis for reversing the JNOV of which Meffert complains based on any failure on the part of the trial court to comply with the rigorous jurisprudential fact finding standards for JNOV’s as exemplified by such cases as Davis, Adams, and Torrejon, supra.
The crux of this appeal is the fact that in this bifurcated trial the jury allocated 10% of the fault to the City in connection with the breach of the Contract with the plaintiffs, while the trial judge held that no breach of the Contract occurred, i.e., the City was free of fault and liability. Based upon this seeming inconsistency, Meffert makes two main arguments in this appeal: First, that a prerequisite to a claim of tortious interference with a contract is that there be a breach of the contract. To put it another way, one could characterize Meffert’s argument as, that in the absence of a breach of contract, there is no cause of action for tortious interference. Therefore, based on the Court’s finding that there was no breach of the Contract, Mef-fert contends that the plaintiffs have no claim for tortious interference with the *946 Contract, thereby invalidating the substantial damage award by the jury against Mr. Meffert for his tortious interference with the Contract. Second, that as a result of the inconsistency between the jury’s attribution of 10% fault to the City for tortious interference with the Contract and the finding by the trial judge that there was no breach mandates a de novo review by this Court.
| ,aAs to the second of Meffert’s contentions, it is his position that the failure of the trial court to recognize that there can be no cause of action for tortious interference where the actions complained of do not result in an actual breach of the contract at issue, is an error of law. The plaintiff argues that it follows that as the denial of his JNOV motion was based on legal error, this Court is bound to perform a de novo review of the trial court’s denial of the JNOV. In support of this argument, the plaintiff cites: Bell v. Glaser, 08-0279, p. 4 (La.App. 4 Cir. 7/1/09), 16 So.3d 514, 516; Edwards v. Pierre, 08-0177, p. 9 (La.App. 4 Cir. 9/17/08), 994 So.2d 648, 656; and Audubon Orthopedic and Sports Medicine, APMC v. Lafayette Ins. Co., 09-0007, p. 19 (La.App. 4 Cir. 4/21/10), 38 So.3d 963, 977. Bell and Edwards stand for the proposition that when a trial court commits legal error, an appellate court is required to review the record de novo. The Audubon Orthopedic and Sports Medicene ease stands for the slightly different proposition that we review legal errors de novo, i.e., we are never bound by the trial court’s conclusions of law. As Meffert’s appeal involves assertions of error as to legal issues rather than factual disputes, his arguments fall under the Audubon Orthopedic and Sports Medicene maxim that this Court reviews legal errors de novo rather than arguing that because of legal errors he is entitled to a factual de novo review of the record.
The first issue to be decided by this Court is whether an action for tortious interference can be maintained in the absence of a finding that the Contract was, in fact, breached. In other words, can there be a cause of action for tortious interference where there is no breach? Whether it is essential to a claim of tortious interference with a contract that there be an actual breach of that contract is a |2nquestion of law which we review de novo. Scott v. Department of Housing & Neighborhood Development, 08-0919, p. 3 (La.App. 4 Cir. 10/1/08), 995 So.2d 1249, 1251; Williams v. Fahrenholtz, 08-0961, p. 101-102 (La.App. 4 Cir. 7/25/08), 990 So.2d 99, 101.
Pertinent to the Plaintiffs’ action for damages arising from tortious interference with contractual relationship, the jury answered “yes” to the following question:
Do you find by a preponderance of the evidence that the City of New Orleans breached its Contract with Southern Electronics or that Southern Electronics performance under the Contract was intentionally caused to be impossible or more burdensome?”
The jury then found that both Meffert and Imagine Software “caused the breach of the City of New Orleans’ Contract with Southern Electronics or intentionally made Southern Electronics’ performance of the Contract impossible or more burdensome” and that both Meffert and Imagine Software lacked justification for their actions.
Basically, Mr. Meffert complains that for the trial court to have held him liable for intentional interference with a contract, per force, the trial court must have also determined that he induced an actual breach of that contract. In support of this contention, Mr. Meffert cites Hemmans v. State Farm Ins. Co., 94-0496 (La.App. 4 Cir. 3/21/95), 653 So.2d 69, 77; accord, Sun Drilling Prods. Corp. v. Rayborn, 00-1884 *947 (La.App. 4 Cir. 10/3/01), 798 So.2d 1141, 1155.
The seminal case in Louisiana jurisprudence concerning tortious interference is 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228 (La.1989). That case is best 12i known for its declaration of the five elements of a claim for tortious interference with a contractual relationship as follows:
(1) the existence of a contract or a legally protected interest between the plaintiff and the corporation; (2) the corporate officer’s knowledge of the contract; (3) the officer’s intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome; (4) absence of justification on the part of the officer; (5) causation of damages to the plaintiff by the breach of contract or difficulty of its performance brought about by the officer.
Id., 538 So.2d at 234.
However, 9 to 5 Fashions, Inc.’s declaration of the existence of a duty is much more direct, simpler and to the point concerning the instant case, where the opinion refers to:
... a corporate officer’s duty to refrain from intentional and unjustified interference with the contractual relation between his employer and a third person.
9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 234 (La.1989).
It is much simpler to understand this case in terms of that duty: Who can doubt that Meffert as a public official owed a duty to the plaintiffs-appellants to perform in a manner consistent with his official duties?! By the standards of .9 to 5 Fashions, Meffert had a duty “to refrain from intentional and unjustified interference with the contractual relation between his employer [the City] and a third person [the plaintiffs, dealing with the City].” In the instant case, Meffert’s acts were intentional as distinguished from the negligent acts of the defendant in .9 to 5 Fashions, Inc., and, therefore, meet the criteria of the five elements set forth in 9 to 5 Fashions, Inc. We would like to believe that, as a matter of public policy, the duty owed by a public official in such circumstances is, if anything, greater b^than the ordinary duty owed by a private employee of a private employer, rising to the level of a fiduciary, or if not technically a fiduciary, something very much akin to such a duty.
As the Louisiana Supreme Court explained in 9 to 5 Fashions, Inc. in creating what was then the novel liability theory in Louisiana of tortious interference with a contract:
Nevertheless, as general rules of action, they are consistent with civilian delictual principles and implemental of present day moral, social and economic values.
9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 232 (La.1989).
As regards the duty of a public servant to perform his duties faithfully, that is a concept of much greater vintage even than that referred to in 9 to 5 Fashions, Inc., as “implemental of present day moral, social and economic values.”
Mr. Meffert cites Sun Drilling Products Corp. v. Rayborn, 00-1884 (La.App. 4 Cir. 10/3/01), 798 So.2d 1141, for the proposition that without a finding “of a breach of contract, no cause of action lies for tortious interference with a contract.” Sun Drilling does have language to that effect. Id., 00-1884, p. 12, 798 So.2d at 1151. However, later in the same opinion this Court expands on the concept of tortious interference in language consistent with and in reliance upon .9 to 5 Fashions:
An officer of a corporation owes an obligation to a third person having a contractual relationship with the corpora *948 tion to refrain from acts intentionally causing the company to breach the contract or to make performance more burdensome, difficult or impossible or of less value to the one entitled to performance, unless the officer has reasonable justification for his conduct. The officer’s action is justified, and he is entitled to a privilege of immunity, if he acted within the scope of the corporate authority and in the reasonable belief that his action wasjjgfor the benefit of the corporation. 9 to 5 Fashions, Inc. v. Spurney, 538 So.2d 228, 231 (La.1989).
Sun Drilling Products 00-1884, p. 798 So.2d at 1155.
Thus, based on the language highlighted above from Sun Drilling this Court recognized that tortious interference was not limited solely to a breach of contract, but also could encompass acts that would “make performance more burdensome, difficult or impossible or of less value to the one entitled to performance,” consistent with the plaintiffs’ theory of the case now before us.
Similarly in Hemmans v. State Farm Ins. Co., 94-0496 (La.App. 4 Cir. 3/21/95), 653 So.2d 69, 77, this Court focused on the issue of breach:
Applying these legal precepts to the case before us, we find that one element of this cause of action must necessarily be a finding of a breach of the contract, which we have concluded did not occur in this case. As State Farm did not breach its contract with Hemmans, it follows that West and Barr cannot be held liable for intentionally causing the breach.

Id.

The “legal precepts” referred to in the language highlighted above from Hem-mans are the precepts set forth in 9 to 5 Fashions, including the following: “[T]he officer’s intentional inducement or causation of the corporation to breach the contract or his intentional rendition of its performance impossible or more burdensome.” Hemmans v. State Farm Ins. Co., 94-0496 La.App. 4 Cir. 3/21/95, 653 So.2d 69, 77. Thus, while this Court was focused on the issue of breach in the Hemmans case, the authority upon which this Court based its opinion, i.e., the precepts found in 9 to 5 Fashions, were broad enough to encompass a claim for the “intentional rendition of its [the Contract] performance impossible or more burdensome.”
124It is significant that this Court in Hemmans did not stop with its finding that there was no breach, which is what we would have done if that were the end of the matter as Mr. Meffert contends. That this Court in Hemmans did not take the position that the only issue was one of breach is demonstrated by the fact that it then went on to analyze the facts in terms of the fourth criterion, “absence of justification on the part of the officer,” a criterion of particular significance to Mr. Meffert’s position in this case as he, in the context of this case, is the “officer” envisioned by the fourth 9 to 5 Fashions criterion. In Hemmans, after finding that State Farm did not breach its contract with the plaintiff, Hemmans, a finding analogous to the trial court’s finding in the instant case that the City did not breach its contract with the plaintiffs, this Court went on to evaluate the culpability, if any, of certain State Farm officers, officers who stood in positions analogous to that of Mef-fert in the instant case, explaining that:
Further, there is ample evidence in the record that Robert West and Guy Barr as corporate officers of State Farm were acting within the scope of their corporate authority in their adoption and application of the loss control program. Guy Barr testified at trial that he and Robert West had met in early 1990 to *949 discuss methods to solve the problems of large losses on State Farm’s automobile policies. He testified that the president of the corporation sanctioned their efforts to try to control the losses that were being experienced in their region. We have found no evidence in the record, nor has plaintiff indicated such, to support a finding that West or Ban-acted outside the corporate authority in adopting this program.
Under these circumstances, where plaintiff failed to prove that the corporate officers acted outside of their corporate authority or in a manner they knew to be detrimental to the corporate interest, plaintiff’s claims for interference with contractual relations against these officers is not actionable. The jury was clearly wrong in concluding otherwise.
Hemmans, 94-0496, pp 14-15 (La.App. 4 Cir. 8/21/95), 658 So.2d at 77. There would have been no need for this Court to have examined the actions of certain State Farm officers after we had found that there was no breach of the contract if the finding of no breach were fully dispositive of the case. Additionally, we note that there is not even a suggestion in Hem-mans that the question of “breach” is fully dispositive of the question of tortious interference where the actions of an “officer” such as Mr. Meffert are concerned.
Therefore, we find that an action may lie for tortious interference even in the absence of a breach, and that there is more than enough evidence in the record[3] to support a finding that Meffert’s actions rendered the performance of the plaintiffs’ Contract with the City impossible and/or more burdensome, consistent with the criteria set forth in 9 to 5 Fashions. As such, there is no legal error in the findings of the jury and the trial court.
Having determined that the plaintiffs can recover for tortious interference even in the absence of a breach, we will now address Meffert’s assertion that the allocation of 10% fault to the City jury and the finding of the trial judge that there was no breach of Contract by and no liability on the part of the City creates an inconsistency as a matter of law, making the denial of his JNOV motion error.
In her written reasons for judgment issued in connection with the judgment of February 4, 2010, the trial judge made the following relevant findings:
1. The jury found Meffert’s actions constituted intentional misconduct. The evidence shows that Meffert had an independent personal stake in the crime camera sales to New Orleans and other cities, and played a pivotal role in assisting Veracent and NetMethods. His actions were clearly outside the scope of his employment with the City.
|2fl2. Further, there is no evidence that Anthony Jones or Mark Kurt, as Chief Technology Officers in the Mayor’s Office of Technology, knowingly assisted or participated in a scheme with Meffert. Therefore, the Court does not find soli-dary liability between the City, Meffert, Veracent and Dell.
We note that the jury also responded affirmatively to interrogatories characterizing Meffert’s actions as “constituting] willful, outrageous, reckless or flagrant misconduct.”
But of greatest significance to this case were the trial court’s findings concerning the City’s lack of liability for breach of the *950 contract between the City and the plaintiff, Southern Electronic:
Southern Electronics’ contract with the City to provide surveillance camera systems was a supply contract that obligated the City to pay for confirmed orders of crime cameras.
Section 3.C.L of the Agreement Between The City of New Orleans and Southern Electronics Supply, Inc. (“Agreement”) provides:
c. New Sites: The parties will establish camera sites as follows:
I. Ordering: In cooperation with the Contractor, the City Project Manager will Select camera and monitoring installation sites and the equipment and connection to be installed at each. Using the Order Form at Attachment “C”, he will report the information and specify the required installation to the Contractor. Within five days of receiving the order, and using the order form, the Contractor will 1) detail the installed total cost of the proposed installation, 2) offer to complete the specified installation at the stated cost, and 8) request the City’s written approval thereto. The Contractor may consider the offer and request to the City refused unless within forty-five days after it receives the Contractor’s request for approval the City delivers the Contractor 1) its written approval to the order AND 2) 50% of the Instated cost. Relative to the installation, the City’s approval will confirm the parties’ obligations to install, inspect, accept, and pay as below provided.
Pursuant to this provision, the City’s Project Manager will select installation sites and place orders for cameras. Southern could accept or reject the City’s order and, if accepted, the City had 45 days to give written approval and pay 50% of the stated cost. According to these terms, Southern’s action for breach of contract is limited to the cost of cameras ordered and accepted by the City. If the words of a contract are clear and explicit, interpretation is determined by the common intent of the parties. C.C. arts. 2045 and 2046.
Plaintiff seeks recovery for the installation cost of 240 cameras and maintenance changes [sic] it contends were guaranteed pursuant to its contract with the City. It is undisputed that Southern installed only sixty (60) cameras during the contract with the City. Southern does not contend there is a balance owed for these cameras, for orders approved and not yet delivered; or for change orders or additional work.
Additionally, the maintenance provision of the contract required the parties to adjust advance annual payment according to a formula outlined in section 5.b. of the Agreement. (Plaintiffs’ Exhibit 2, p. 4). There is no evidence of a guaranteed payment to Southern according to these terms and no evidence of any outstanding invoices.
Thus, Southern’s claim for breach of contract is denied because there is no evidence of any recoverable damages under the express terms of its contract with the City of New Orleans.
Consistent with the finding that there was no breach of the Contract, the trial court dismissed the plaintiffs’ claims against the City for breach of contract. In her reasons for denying Meffert’s JNOV motion, the trial judge found:
The evidence at trial shows that Meffert intentionally and without justification complained about Southern’s performance, made unwarranted demands and created payment problems making it impossible for it to perform its contract with the City. Therefore, the Court’s determination that the City did not *951 breach it’s [sic] ^contact with Southern doesn’t affect the jury’s finding against Meffert for tortiously interfering with its contract.
The jury finding allows for the trial court’s finding that the Contract may not have technically been breached. The jury findings can be read to mean that it found either that the City breached its Contract with the City or that Meffert and/or Imagine Software had intentionally caused Southern Electronic’s performance under the contract to be more burdensome. When the trial judge considered the evidence at trial, she agreed with the jury that the evidence showed “that Meffert intentionally and without justification complained about Southern’s performance, made unwarranted demands and created payment problems making it impossible for it to perform its contract with the City.” Given that both fact finders found that Meffert was liable to the plaintiffs for tortious interference with their contractual relationship with the City, the two fact finders are not inconsistent on that count. Thus, the jury verdict is consistent with the trial court judgment both (1) in its conclusion that Meffert interfered tortuously with the plaintiffs Contract with the City and (2) in the allocation of 43% of the fault to Meffert.
Meffert relies entirely on his argument that there can be no claim for tortious interference in the absence of a breach and, therefore, does not challenge the findings that he made the performance of the Contract more burdensome or impossible to perform. Therefore, we find no basis in the record or in Meffert’s brief to this Court to reverse the findings that he made the Contract impossible and/or more burdensome for the plaintiffs to perform.
There is no legal inconsistency between the allocations of fault made by the jury and the trial judge in the instant case. While the trial judge and the jury did not reach the same conclusions concerning the fault of the City, that does not | ^create an ipso facto inconsistency as a matter of law. This is easy to see if we substitute the City and Meffert for the analogous parties in State Farm Mut. Auto. Ins. Co. v. LeRouge, 07-0918 (La.App. 4 Cir. 11/12/08), 995 So.2d 1262. Just as this Court found in LeRouge, we find that “the jury had no authority to determine the fault of [the City]; it did, however, have authority to allocate fault to the remaining defendants, and chose to allocate [43% to Mr. Meffert].” Id., 07-0918, p. 13, 995 So.2d at 1273.
This Court further explained in LeRouge, based on its prior decision in Madison v. Ernest N. Mortal Convention Center-New Orleans, 00-1929, 01-1127, pp. 12-13 (La.App. 4 Cir. 12/4/02), 834 So.2d 578, 587, “there is no irreconcilable inconsistency where the total fault assigned is less than or equal to one hundred percent.” LeRouge, 07-918, p. 13, 995 So.2d at 1273. While the result may seem inconsistent and counter intuitive from the perspective of a typical mathematical proposition where everything adds up to 100%, it is completely consistent with the legal concept of how fault is allocated. In other words, “inconsistency” in this context is a term of art and the fact that the allocations of fault by a judge and a jury in a bifurcated trial may not agree with mathematical precision does not render them inconsistent. Legally, it is recognized that the allocation of fault is not an exact science. This is the reason that this Court reviews allocations of fault according to the manifest error standard of review. We do not reverse fault allocations made by the fact finder just because we believe that we would have allocated fault slight differently had we been the fact finder— within reason. As the law allows the fact *952 finder some latitude in the allocation of fault, i.e., such allocation must necessarily be to some extent subjective, it is only natural that two different, but reasonable, fact finders would reach differing conclusions. In fact, it | snwould really be surprising if they did not where multiple parties are involved, except in the most obvious cases, such as where one party is clearly totally at fault.
Where fault must be allocated among a number of parties, reasonable fact finders may easily differ within reasonable parameters as to the precise percentage to be assigned to each party. Therefore, it is logical that, as a matter of law, the fact that the jury and the trial judge did not agree on the amount of fault to be allocated to the City does not per se vitiate the fault allocations made by the jury to the other defendants, as long as those allocations are within acceptable parameters under the standard applicable to jury comparative fault allocations and does not exceed 100%. This is especially true where the 10% of fault over which the judge and jury failed to agree was such a small part of the overall allocation of fault. Accordingly, we find no “inconsistency” in the differing fault allocations made by the trial court and the jury concerning the City.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED
ORDER
IT IS HEREBY ORDERED THAT the Motion for leave to File Application for Rehearing En Banc Out of Time filed by the defendant-appellant, Greg Meffert, is denied.
IT IS FURTHER ORDERED THAT the Application for Rehearing filed by the defendant-appellant, Greg Meffert, is denied.

. The transactions involved in this case figured prominently in Mr. St. Pierre’s recent highly publicized federal criminal trial in which he was convicted. Mr. Meffert testified as a witness for the government in that trial after having entered into a plea agreement. This Court received a letter from Mr. Mef-fert’s attorney dated June 8, 2011, in which he disavowed any knowledge of inconsistencies in the testimony given by Mr. Meffert in these proceedings and testimony he may have given in the federal criminal proceedings. He emphasizes in the letter that "as the only issue on appeal is a legal one, and not prem *938 ised in any way on any testimony, any possible false testimony should not be material to the only current proceeding, that being Mr. Meffert’s appeal.”

. During the course of the proceedings in the trial court, various parties made numerous writ applications to this Court and to the Supreme Court of the State of Louisiana, some of which were successful and some of which were not. However, while Meffert's motion for a devolutive appeal technically states that it encompasses all interlocutory "judgments, orders and decrees,” he has not raised any arguments on appeal regarding any of them.

. This is especially true where Meffert has failed to asserted any factual assignments of error.